**United States Court of Appeals**
**Fifth Circuit**

**F I L E D**

**August 17, 2005**

Charles R. Fulbruge III
Clerk

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

No. 03-20401

ROY GENE SMITH,

Petitioner-Appellant,

versus

DOUG DRETKE, Director,
Texas Department of Criminal Justice,
Correctional Institutions Division,

Respondent-Appellee.

Appeal from the United States District Court
for the Southern District of Texas

Before SMITH, DeMOSS, and STEWART, Circuit Judges.

CARL E. STEWART, Circuit Judge:

Petitioner-appellant Roy Gene Smith ("Smith") was convicted in the Texas state courts and sentenced to death for the capital murder of James Whitmire. The district court denied Smith's petition for a writ of habeas corpus and denied a certificate of appealability (COA) *sua sponte*. Smith now requests a COA from this court on three issues, (1) whether his trial counsel provided ineffective representation, (2) whether the jury instructions given at the sentencing phrase of his trial violated

his constitutional rights pursuant to <u>Penry v. Johnson</u>,[1] and (3) whether the district court erred in denying his request for funds under 21 U.S.C. § 848 for a psychologist. For the foregoing reasons, we grant a COA as to Smith's ineffective assistance of counsel and <u>Penry</u> claims. However, we find that the district court did not abuse its discretion in denying Smith's request for funds.

<u>Factual and Procedural Background</u>

On October 8, 1988, Smith and Mary Williams ("Williams") spent the day smoking crack cocaine at a boarding house. Around 8:00 p.m., Smith and Williams left the boarding house. As they walked down the street, they came upon 67-year-old James Whitmire. Smith approached Whitmire and asked him for a job. Whitmire responded that he had no work available and then turned away. Smith unzipped his jacket, drew a .22 caliber pistol, and began shooting Whitmire. After Whitmire fell Smith continued shooting, hitting him several times. Williams fled the scene. After Whitmire was dead, Smith searched his pockets and stole $4.27. As Smith rifled through Whitmire's clothing, two men approached Smith and asked him what he was do ing. The men fled when Smith began shooting at them. Smith later reunited with Williams and they purchased hot dogs with the stolen money. The couple spent the night in an abandoned house.

The next day, Williams returned to her home and contacted the police. The police searched for Smith and, after a chase, placed him under arrest. Smith subsequently signed a written statement that the district court regurgitated as follows:

> Last night I approached a guy and robbed him. When I pull my pistol he hollered "I'm not giving up my money." I already had it cocked. I just kept firing. Afterwards I reached into his left back pocket and took his wallet, and his front pocket had $4.27 in it. The wallet had no money.

---

[1] 532 U.S. 782 (2001).

The gun I used was a .22 revolver, I don't know the make. The guy that got shot was an old guy, I'd say about 54 or 55. After I shot him I ran all the way back to Mills Court. I hid in an abandoned house, and stayed there until daybreak. About 3:00 to 3:15 this afternoon, I went to the park. I had the gun in a brown paper bag. The next thing I knew was that you all arrived. I rolled over the hill and peeped up, and saw that you all were coming up. I panicked and ran. I ran to this old abandoned garage and threw the pistol down in the yard, by the garage. I climbed up in the garage, and hid, and that is when the officer opened the door. This is the God honest truth.

Smith v. Cockrell, No. H-00-1771, slip op. at 2-3 (S.D. Tex. filed March 31, 2003). Smith also confessed that in the week prior to the homicide, he committed another capital murder, another shooting, and several robberies.

After a jury trial, Smith was convicted of capital murder in the 208th Judicial Court of Harris County, Texas, Judge Benjamin A. Martinez presiding. The district court summarized the evidence adduced at the punishment phase of trial as follows:

During the punishment phase of trial, the State elicited testimony concerning Smith's extensive criminal history. The State also introduced evidence relating to Smith's week-long crime spree before Whitmire's homicide, including his confession to several crimes. Additionally, the State introduced testimony of violent threats by Smith in prison and his poor parole history.

At the punishment phase, the defense presented testimony from Smith's sister, Carolyn Smith, who described the crime-ridden environment her brother lived in [ Smith grew up in an area in Houston, Texas known as 'Fifth Ward'] and testified that she had never known her brother to use crack cocaine. She also described her brother as calm and not violent. Smith's mother, Wilbert Lee Smith, testified on his behalf. She testified that her son never used crack cocaine or carried a gun. She also described her son's childhood and the crime-infested neighborhood in which she lived, commented on his good behavior in the penitentiary, and pleaded for mercy. A Harris County Sheriff's Deputy, Thomas Gentry, testified that Smith had no major trouble while previously incarcerated. Finally, Smith took the stand himself and explained that he had been on a drug binge at the time of the homicide and did not remember killing Whitmire. Smith also expressed remorse for the killing.

Id. at 3-4.

Following the admission of this evidence, the state trial court instructed the jury to answer Texas' special issue questions in the negative if the mitigation evidence sufficiently required the imposition of a life sentence. On May 11, 1990, the jury affirmatively answered all three special issues and the trial court sentenced Smith to death by lethal injection accordingly. The Texas Court of Criminal Appeals affirmed Smith's conviction and sentence on February 24, 1993. Smith v. State, No. 71,009 (Tex. Crim. App. 1993). The United States Supreme Court denied Smith's petition for a writ of certiorari on November 15, 1993. Smith v. Texas, 510 U.S. 979 (1993).

Collateral proceedings then ensued. On April 18, 1997, Smith filed a state writ of habeas corpus raising one ground for relief. The presiding judge at the time of trial was not the same judge presiding over Smith's state habeas petition. On August 24, 1999, the state habeas court, in the absence of an evidentiary hearing, entered findings of fact and conclusions of law recommending the denial of state habeas relief. On September 29, 1999, the Texas Court of Criminal Appeals affirmed the denial of habeas relief. Ex Parte Smith, No. 42, 801-01 (Tex. Crim. App. 1999).

On May 30, 2000, Smith timely filed his federal petition for a writ of habeas corpus under 28 U.S.C. § 2254. This case arises on appeal from the United States District Court for the Southern District of Texas, Houston Division, Judge Ewing Werlein, Jr. presiding. The State moved for summary judgment. On March 31, 2003, the district court granted the State's motion for summary judgment denying Smith relief without an evidentiary hearing and dismissed the writ petition in an unpublished decision. Smith v. Cockrell, No. H-00-1771 (S.D. Tex. filed March 31, 2003). The district court also denied Smith's COA request *sua sponte*. On September 22, 2003, Smith timely filed his appeal, requesting a COA from this court.

## Standard of review

4

Because Smith's federal petition for habeas review was filed on May 30, 2000, we review it under the standards articulated in the Antiterrorism and Effective Death Penalty Act ("AEDPA"). See 28 U.S.C. § 2254. To obtain a COA, the petitioner must make a "substantial showing of a denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To make such a showing, the petitioner must demonstrate "that reasonable jurists could debate whether [] the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'" Slack v. McDaniel, 529 U.S. 473, 484 (2000) (quoting Barefoot v. Estelle, 463 U.S. 880, 893 n.4 (1983)).

In determining whether to grant a COA, our inquiry is limited to a threshold examination that "requires an overview of the claims in the habeas petition and a general assessment of their merits." Miller-El v. Cockrell, 537 U.S. 322, 336 (2003). A full consideration of the merits is not required, nor permitted, by § 2253(c)(2). Id. The fact that a COA should issue does not mean the petitioner will be entitled to ultimate relief, rather "the question is the debatability of the underlying constitutional claim, not the resolution of that debate." Id. at 342. Accordingly, we must be mindful that "a claim can be debatable even though every jurist of reason might agree, after the COA has been granted and the case has received full consideration, that petitioner will not prevail." Id. at 337. At the COA stage, we do not apply the deferential AEDPA standard of review to examine the merits of the habeas petition. Id. at 342 ("Before the issuance of a COA, the Court of Appeals had no jurisdiction to resolve the merits of petitioner's constitutional claims."). Our immediate task is to determine, not the ultimate merits of Smith's claims, but only whether Smith has demonstrated that "jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed

5

further." Miller-El, 537 U.S. at 327 (citing Slack, 529 U.S. at 484). "Because the present case involves the death penalty, any doubts as to whether a COA should [be] issue[d] must be resolved in [the petitioner's] favor." Hernandez v. Johnson, 213 F.3d 243, 248 (5th Cir. 2000).

## Discussion

Smith seeks a COA for each of the following three claims: (1) his trial counsel's inadequate investigation of mitigating evidence in Smith's background and the circumstances of his offense; (2) the nullification instruction submitted by the trial court, which he contends violated the Eighth and Fourteenth Amendments pursuant to Penry v. Johnson, 532 U.S. 782 (2001); and (3) the district court's denial of funds under 21 U.S.C. § 848 for the assistance of a psychologist in his federal post-conviction proceeding. Each claim will be addressed in turn.

I.      Ineffective Assistance of Counsel

Smith appeals from the district court's refusal to grant habeas relief and the denial of his COA as to his claim that his counsel at trial, Ron Mock and Joyce Jones ("trial counsel"), were ineffective because they failed to investigate available mitigating evidence. Specifically, Smith contends that trial counsel provided ineffective assistance by not investigating mitigation evidence pertaining to: his cocaine and alcohol intoxication, his background and upbringing, and his prior disciplinary record from prison.

a.      Exhaustion Requirement

The district court concluded that Smith's ineffective assistance claim was procedurally barred because Smith failed to exhaust his available state remedies. The district court, echoing the state habeas court, held that Smith's state habeas claim dealt with trial counsel's failure to retain a mitigation expert who could provide the jurors with a cohesive picture of Smith's life. The court

6

concluded that Smith's federal habeas petition differed significantly from the state habeas petition because "Smith now argues that trial counsel should have investigated a possible temporary insanity defense, sought prison records suggesting a nonviolent disposition during incarceration, and interviewed Smith's relatives with the intent that they testify in the punishment phase." Smith, No. H-00-1771, slip op. at 18. The district court noted that Smith's present claim of ineffective assistance of counsel turns on factual allegations outside of the record on direct appeal and the record in the state habeas proceedings. Because Smith changed the focus of his federal claim to substantive areas not covered in his state petition, the district court held that Smith's claim for habeas relief was not exhausted. In addition, the court concluded that Smith could not demonstrate cause and prejudice for his failure to exhaust his state remedies.

First, Smith argues that the district court erred in adopting the state habeas court's limited formulation of his ineffective assistance of counsel claim. He concedes that his state habeas claim was inartfully pleaded, but he contends that the state habeas court erred in simply framing his claim as one that challenged his trial counsel's failure to utilize a mitigation specialist when his claim was broadly worded and not limited to the failure to utilize a mitigation specialist. Second, he argues that even assuming *arguendo* that he did fail to exhaust his state remedies, his procedural default should be excused based on his state habeas counsel's deficient performance and the state habeas court's failure to hold an evidentiary hearing. He recognizes that the Fifth Circuit has rejected deficient habeas counsel as a ground to excuse procedural default. However, he contends that deficient habeas counsel is integral to his Due Process and access to courts rights, and the failure of the state courts to ensure he had adequate habeas counsel violated his Due Process rights. He emphasizes that

7

constitutional violations which created a procedural default may justify the "cause" necessary to excuse a default.

"Determining whether a COA should issue where the petition was dismissed on procedural grounds has two components, one directed at the underlying constitutional claim[] and one directed at the district court's procedural holding." Slack, 529 U.S. at 484-85. Where the district court has dismissed the petition on procedural grounds, "a COA should issue when the prisoner shows . . . that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." Id. at 484. In addit ion, because the district court, after denying Smith's petition on procedural grounds, nonetheless reached the merits of Smith's constitutional claim, Smith must also show that "reasonable jurists would find the district court's assessment of the constitutional claim[] debatable or wrong." Id. "Each component . . . is part of a threshold inquiry[.]" Id. at 485. As to the first threshold inquiry, we find that jurists of reason could debate whether Smith exhausted his claim for ineffective assistance based on trial counsel's alleged failure to investigate potential mitigating evidence.

A fundamental prerequisite to federal habeas relief under § 2254 is the exhaustion of all claims in state court prior to requesting federal collateral relief. Rose v. Lundy, 455 U.S. 509, 519-20 (1982). A federal habeas petition should be dismissed if state remedies have not been exhausted as to all of the federal court claims. Id.; see also 28 U.S.C. § 2254(b)(1)(A) (writ shall not be granted unless it appears that the applicant has exhausted state remedies). The exhaustion requirement is satisfied when the substance of the federal habeas claim has been fairly presented to the highest state court. Picard v. Connor, 404 U.S. 270, 275-78 (1971). A federal court claim must be the "substantial equivalent" of one presented to the state courts if it is to satisfy the "fairly presented"

8

requirement. Id. The habeas applicant need not spell out each syllable of the claim before the state court to satisfy the exhaustion requirement, Lamberti v. Wainwright, 513 F.2d 277, 282 (5th Cir. 1975), however, the petitioner cannot present new legal theories or new factual claims in his federal application. Nobles v. Johnson, 127 F.3d 409, 420 (5th Cir. 1997).

The ineffective assistance of counsel claim submitted by Smith's state habeas counsel, Stephen Christopher Taylor, in the state petition averred that:

> Trial Counsel failed to investigate Applicant's history to discover evidence which could have been used to Applicant's advantage in mitigation of punishment. A "comprehensive biopsychosocial life history outline or evaluation" was necessary in establishing mitigating evidence for the punishment phase of Applicant's trial. Such an examination is designed to "detect the presence of significant factors such as neurological impairment; cognitive disabilities; physical, sexual, or psychological abuse; substance abuse; mental disorders; or other factors which influence the development of Applicant's personality and behavior. A social history investigation would have explained Applicant's developmental history and the links between that history with Applicant's conduct at the time of the offense. The mitigation specialist, as a professional and impartial third party, would have tied together the specific incidents of Applicant's life and interpret them so as to provide the jurors a cohesive picture of the life Applicant lived.

The state petition went on to state that Smith was prejudiced by trial counsel's failure because "reasonably competent trial counsel would have conducted an investigation into the life history of Applicant for use by a mitigation specialist during the punishment stage of Applicant's trial. Trial Counsel's conduct in failing to investigate Applicant's life history denied Applicant the ability to have a mitigation specialist provide the jurors with a cohesive picture of the life that Applicant lived."

The state petition did assert that a "biopsychosocial outline" should have been developed, which could have been used by a mitigation specialist at trial. However, the argument is broadly stated such that one could reasonably argue that Smith's claim was not confined to trial counsel's failure to retain a mitigation expert but rather was a more general claim that his trial counsel failed

9

to investigate Smith's history. Smith's state habeas argument could be defined as asserting that trial counsel was ineffective *for failing to investigate Smith's history* and as a result Smith was prejudiced because trial counsel could not retain a mitigation expert who could then present said history before the jury. It is not a strain to categorize Smith's state habeas argument as a general assertion that trial counsel failed to investigate Smith's background. Smith's argument in his writ was likely enough to alert the state habeas court that he was asserting a constitutional claim concerning the adequacy of his trial counsel's investigation of mitigating evidence. See Soffar v. Dretke, 368 F.3d 441, 468 (5th Cir. 2004); see also Schneider v. Delo, 85 F.3d 335, 339 (8th Cir. 1996) (holding that the fairly presented analysis "is not meant to trap a petitioner who has poor drafting skills. The stakes in habeas cases are too high for a game of legal 'gotcha.'"). Therefore, it is debatable whether the district court erred in finding that Smith did not satisfy the exhaustion requirement as to the legal ground for his ineffective assistance of counsel claim.

However, even if Smith did adequately assert the legal ground for his ineffective assistance of counsel claim, the State argues that Smith failed to make any factual allegations to support his claim and therefore, his claim was not fully and fairly presented to the state habeas court. See Keeney v. Tamayo-Reyes, 504 U.S. 1, 9, 10 (1992) (holding that AEDPA's exhaustion requirement requires more than notice, more than petitioner simply stating a federal claim in state court; it requires that the petitioner afford the state court a full and fair opportunity to address his claim). The State emphasizes that Smith's state habeas counsel did not detail any mitigating facts which should have been presented on Smith's behalf, nor did the state writ application contain any affidavits setting out specific mitigation facts that were omitted by trial counsel. Cf. Banks v. Dretke, 124 S.Ct. 1256 (2004) (finding that the petitioner satisfied the exhaustion requirement as to the legal ground of his

10

Brady claim but the petitioner did not produce evidence to substantiate his claim, therefore the petitioner did not fully and fairly present the claim to the state court).

We find that reasonable jurists would find it debatable whether the ineffective assistance of counsel claim was fully and fairly presented to the state habeas court. The state habeas petition was not supported by the affidavits now before this court; nevertheless, reasonable jurists could find it debatable whether the petition did assert specific mitigating facts omitted by trial counsel when the petition averred that "trial counsel did not investigate signs of neurological impairment, cognitive disabilities, physical, sexual or psychological abuse, substance abuse, mental disorders or any other factors that may have influenced his development." Thus, it is debatable whether Smith presented a factual as well as a legal basis to support his constitutional claim.

Smith has shown that reasonable jurists could debate whether the legal and factual basis for his ineffective assistance of counsel claim was fully presented to the state habeas court. We proceed to the next step in the inquiry into whether to grant a COA on this issue, namely, the underlying merits of his constitutional claim.

b.      Merits of Smith's Ineffective Assistance of Counsel Claim

Smith argues that trial counsel were ineffective for deciding what mitigation evidence to present during the punishment phase because their decision was based upon an incomplete and superficial investigation of potential mitigating evidence. Specifically, Smith asserts that trial counsel did not adequately investigate (1) Smith's drug and alcohol use and the possibility of a mitigation defense of temporary insanity; (2) Smith's prison records from previous incarcerations to show his good behavior while in prison; and (3) Smith's troubled background and abusive upbringing.

11

Even though the district court found that Smith had not exhausted his state remedies, it still went on to address the merits of Smith's ineffective assistance of counsel claim. As to Smith's claim that trial counsel should have investigated his voluntary intoxication, the district court held that Smith's history of substance abuse would have been presented for the purposes of raising a temporary insanity issue. Because the district court concluded that the facts that Smith asserts are insufficient to raise a valid intoxication insanity defense, the court held that it was reasonable for trial counsel to decline to present the evidence. As to Smith's prison records that demonstrate his prior good behavior while imprisoned, the district court held that trial counsel was not ineffective for not presenting the records because trial counsel adduced direct evidence of Smith's good behavior while incarcerated, namely, the testimony of Deputy Gentry. Finally, the district court concluded that contrary to Smith's assertion, trial counsel did adequately investigate Smith's upbringing and background. The district court relied on the affidavits of trial counsel who stated that they interviewed many of Smith's family members and childhood acquaintances and made a strategic decision to only put on the testimony of Smith's mother, sister and Deputy Gentry. Moreover, the district court held that even if trial counsel failed to make an adequate investigation, Smith did not show that trial counsel would have made a different decision about trial strategy had they interviewed the witnesses Smith now presents. The district court averred that trial counsel's strategy at sentencing was to show that Smith could exist peacefully in prison society and Smith's mother was integral to this strategy. The evidence Smith now adduces would discredit Smith's mother because it paints her as dysfunctional. Therefore, the district court concluded that based on trial counsel's strategy, it is unlikely they would have made a different decision concerning the testimony presented in the punishment phase.

12

Smith argues that trial counsel erroneously decided to forego having a psychologist testify as to Smith's cocaine and alcohol abuse. Smith contends that although he informed his trial counsel that his drug use contributed to the commission of the offense, trial counsel did not develop the evidence to demonstrate the extent of his abuse nor request an instruction that temporary insanity caused by intoxication be considered as mitigating evidence. Smith argues that trial counsel erred in basing their belief that Smith was sane on his appearance and behavior at trial. Instead, Smith asserts that trial counsel should have explored the issue of the psychological impact of his substance abuse in order to demonstrate his mental state *at the time of the offense*. Smith argues that there is sufficient evidence to raise the issue of intoxication-based temporary insanity and therefore, trial counsel were ineffective for failing to investigate this ground for mitigation.

Next, Smith argues that trial counsel did not adequately investigate his upbringing. He notes that trial counsel's affidavits give no details as to exactly who they contacted or what was learned from the individuals they contacted. He contends that the record supports the conclusion that trial counsel only contacted those individuals who actually testified at trial, namely, his mother, his sister Carolyn, and Deputy Gentry. Had trial counsel conducted a reasonable investigation, Smith contends that they would have discovered the neglect and physical abuse he suffered as a child, and his mother's alcohol and drug use. He asserts that trial counsel were not aware of this information because they conducted an inadequate investigation.

Finally, Smith contends that trial counsel conducted an incomplete investigation into Smith's prior disciplinary records from prison. Smith admits that trial counsel did present the testimony of Deputy Gentry to speak to his good behavior during prison. Deputy Gentry was familiar with Smith because Smith was in his custody at the time of trial and had been in Gentry's custody during a

13

previous incarceration. However, Smith notes that Deputy Gentry was forced to concede that Smith was isolated from other prisoners during his capital trial. Smith asserts that further investigation would have revealed that during his several stays in the Texas prison system he has a near spotless disciplinary record, with the exception of a minor write up. He contends that it is unclear the extent to which trial counsel reviewed Smith's prison disciplinary records and why trial counsel failed to present additional disciplinary records.

The State counters that trial counsel's decision not to utilize a psychiatric professional to testify as to the impact of his substance abuse was a strategic decision, and that decision was reasonable. Had trial counsel introduced such evidence, the State contends the evidence could easily be a "double edged sword" — meaning it could be viewed as an aggravating factor rather than a mitigating factor. Furthermore, the State argues that Smith was not prejudiced by this failure because the facts surrounding the offense are insufficient to raise an intoxication insanity issue. As to the investigation of Smith's upbringing, the State emphasizes that Smith's trial counsel stated in their affidavits that they did interview family members in preparation for sentencing. Finally, the State argues that Smith's trial counsel did in fact adduce direct evidence of Smith's good behavior while incarcerated, thus, trial counsel were not ineffective for failing to secure prison records that contained duplicate information.

We conclude that Smith has demonstrated that reasonable jurists could conclude that the district court's assessment of the ineffective assistance of counsel claim is debatable or wrong. Reasonable jurists could find it debatable whether the facts at bar are sufficiently analogous to the facts the Supreme Court confronted in Wiggins v. Smith such that the district court erred in finding

14

the state habeas court's assessment of Smith's claim objectively reasonable.[2] 539 U.S. 510 (2003). In Wiggins, the trial counsel only alluded to Wiggins' difficult life and his clean criminal record at sentencing. Wiggins asserted that trial counsel were ineffective for failing to retain a forensic social worker to prepare a social history even though the State made funds available for that purpose. If trial counsel had prepared a social history, they would have discovered the severe physical and sexual abuse he suffered. The state habeas court denied him relief because it found that counsel's decision not to investigate and present certain mitigation evidence was based on trial strategy and was thus not ineffective. Moreover, the state court noted that trial counsel obtained social service records that did detail some abuse and mental retardation; thus, trial counsel were aware to some extent, and did conduct some investigation into Wiggins' unfortunate childhood.

In reversing the state habeas court, the Supreme Court restated that deference is owed strategic judgments made by trial counsel. However, the Court emphasized that deference is owed strategic decisions *when the investigation supporting those judgments was adequate*. Wiggins, 539 U.S. at 521-22. Where trial counsel has not "fulfill[ed] their obligation to conduct a thorough investigation of the defendant's background," "counsel's failure to uncover and present voluminous mitigating evidence at sentencing could not be justified as a tactical decision." Id. at 522 (quoting Williams, 529 U.S. at 396). Therefore, the "principal concern in deciding whether [trial counsel]

---

[2] Wiggins was announced after the district court's ruling but it should not be considered a "new rule" such that Teague v. Lane might bar habeas relief. The Court in Wiggins emphasized that its decision was not a new rule, rather it was squarely drawn from its previous decisions in Strickland v. Washington and Williams v. Taylor, therefore, no new law was created. 539 U.S. at 522-23; See Mackey v. United States, 401 U.S. 667, 695 (1971) (Harlan, J. concurring in part, dissenting in part) (stating that a "new rule" does not occur when a court has simply "applied a well-established constitutional principle to govern a case which is closely analogous to those which have been previously considered in prior case law").

15

exercised 'reasonable professional judgment' is not whether counsel should have presented a mitigation case. Rather, we focus on whether the investigation supporting counsel's decision not to introduce mitigating evidence of Wiggins' background *was itself reasonable.*" Id at 522-24 (internal citations omitted and emphasize in original). The Court held that Wiggins' trial counsel's investigation was inadequate because "counsel abandoned their investigation of petitioner's background after having acquired only rudimentary knowledge of his history from a narrow set of sources." Id. at 524 (citing the ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases 11.8.6, p.133 (1989)(stating that among the topics counsel should consider presenting are medical history, educational history, employment history, *family and social history*, prior adult and juvenile correctional experience, and religious and cultural influences)). Trial counsel did obtain a psychologist to evaluate Wiggins. Trial counsel also procured Wiggins' social services records and had available to them the presentence investigation report. However, the Court found that trial counsel should have nonetheless arranged for a forensic social worker to compile a report of Wiggins' social history, and trial counsel was found ineffective for not so doing.

The Court also held that the scope of trial counsel's investigation was unreasonable in light of the investigation that they did conduct. In trial counsel's investigation, they did discover that Wiggins' mother was an alcoholic, that he was shuttled between foster homes, and that his mother often left him and his siblings alone without food. The Court held that based on this information, a reasonably competent attorney would have further investigated Wiggins' background. "In assessing the reasonableness of an attorney's investigation, a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further." Id. at 527. The Court held that Wiggins' trial counsel "chose to

16

abandon their investigation at an unreasonable juncture, making a fully informed decision with respect to sentencing strategy impossible. . . . As a result, the court's subsequent deference to counsel's strategic decision not 'to present every conceivable mitigation defense,' despite the fact that counsel based this alleged choice on what we have made clear was an unreasonable investigation, was also objectively unreasonable." Id. at 527-28.

Recently, in Rompilla v. Beard, the Supreme Court reaffirmed that a trial counsel's performance cannot be found adequate if it is supported by an unreasonably limited investigation. 125 S. Ct. 2456 (2005). Rompilla's mitigation evidence consisted of testimony from five of his family members who pleaded with the jury for mercy, and asserted that Rompilla was an innocent and good man. Id. at 2460-61. Nonetheless, the jury found that the aggravating factors outweighed the mitigation evidence and sentenced Rompilla to death. Rompilla later presented a habeas claim for ineffective assistance of counsel for trial counsel's failure to present significant mitigating evidence about Rompilla's childhood, mental capacity and health, and alcoholism. Id. at 2461. Rompilla argued that trial counsel should have examined his school records, especially considering several of his family members were unfamiliar with his childhood and trial counsel knew that he had left school after the ninth grade. Id. at 2463. Moreover, Rompilla asserted that trial counsel should have investigated his juvenile and adult incarceration records considering that counsel knew that he had a criminal history. Id. In addition, Rompilla faulted trial counsel for not investigating whether he had a history of alcohol dependency in light of certain indications of alcohol abuse. Id. The Third Circuit found that defense counsel was not ineffective given counsel's efforts in investigating, including interviewing Rompilla, several of his family members, and consulting three mental health experts. Id. at 2461. Moreover, the state court found that defense counsel *extensively* interviewed Rompilla and

17

several of his family members, and that Rompilla was often actively obstructive in assisting trial counsel in his defense. Id. at 2462-63, 2472. The Supreme Court reversed the denial of habeas relief. The Court found that trial counsel's investigation was unreasonable because counsel failed to examine Rompilla's prior conviction file even though the prosecution had acknowledged that it was going to use Rompilla's prior convictions as an aggravating factor to push for the death penalty. Id. at 2464. The Rompilla Court rejected the argument that trial counsel sufficiently investigated Rompilla's prior convictions by reviewing his rap sheet. Id. at 2464 n.3. The Court held that if trial counsel had examined Rompilla's prior conviction file, counsel would have found information that would have made them skeptical of the impression of Rompilla's background they had gotten from the family members thus far. Therefore, counsel would have undoubtably investigated further and uncovered the voluminous mitigating evidence not introduced at trial. Id. at 2468. The Court also rejected the contention that the efforts that counsel did take–namely, extensively interviewing Rompilla and his family, and consulting three mental health experts–were enough to release counsel from investigating further. Id. at 2466-67.

In the present case, a review of the record and the affidavits submitted reveals that jurists of reason could debate whether trial counsel conducted a reasonable investigation. As in Wiggins, counsel in the case before us did investigate possible mitigation evidence. Nonetheless, the Supreme Court made it clear in Wiggins that even though trial counsel did do some investigating, the question was whether the investigation conducted could be considered adequate in light of professional norms. If trial counsel's investigation was unreasonable then the state habeas court's, and the district court's, deference to the strategic decision trial counsel made was also objectively unreasonable.

18

Joyce Jones, co-counsel at Smith's trial, stated that Wilbert Smith's testimony was presented to demonstrate that Smith had a Christian upbringing, he regularly attended school, he did not give his mother problems, and he came from a "stable family that was not only based on Christian beliefs, but was also intact and functional." Jones' statements are contrary to the actual testimony presented at sentencing and to the affidavits submitted by Smith's family members. Therefore, reasonable jurists could debate whether trial counsel conducted a reasonable investigation. Despite Jones' alleged trial strategy, Wilbert Smith did not testify that Smith came from a stable family, regularly attended church and school, and gave the family no problems. Wilbert and Carolyn Smith both testified that Smith came from a disadvantaged background. Specifically, Wilbert Smith testified that Smith's father died in 1971 and Smith grew up very poor. She stated that she supports herself by welfare, and she lives in a high-crime area with fourteen other people crammed into her home. Furthermore, she related how she has helped Smith raise his son since Smith's common law wife died a violent death in 1981. Finally, she begged for the life of her son. Smith's own testimony at sentencing, that he has used drugs and alcohol since the age of 13, also seems to cut against Jones' assertions that Smith regularly attended school, did not give his family problems, and that he came from a functional stable background. Moreover, Smith's affidavit does not support Jones' view that Smith had a stable upbringing. Smith stated in his affidavit that his family lived with his grandmother, Coria Johnson, when he lived in Louisiana and Dallas. He claimed that his mother was frequently absent from the home and would leave him in the care of his grandmother, who was physically abusive to him and his siblings.

The affidavits of Smith's cousins, in particular Bertha Douglas, also cuts against Jones' view of Smith's background. Bertha Douglas, Smith's cousin, grew up next door to Smith's family in both

19

Louisiana and Dallas, until Smith moved to Houston at the age of eleven. Douglas stated in her affidavit that Wilbert Smith "was not a good mother." She accused Wilbert of neglecting her children. She also stated that when Smith and his siblings would "do something Wilbert didn't like, she whipped them something terrible. Wilbert whipped them with cow whips or anything she could get her hands on. Wibert [sic] beat those kids something terrible. They would have bruises, whelps, and cuts after her beatings." Furthermore, she noted that "[a]ll of Wilbert's children ended up on drugs and in prison . . . Four out of five of Wilbert's kids can not read or write. Carolyn is the only one who can a little." Douglas claimed that "Wilbert Smith drank everyday. When we moved to Dallas, Wilbert started dating a man named Tom Jones. Tom Jones was a known drug dealer. . . . I estimate at least 10 to 20 people would come and go from their home everyday. Sometimes people would stay all night. . . . So, at the age of 5 or 6, Roy witnessed his mother drinking, doing and selling drugs." Smith moved to Houston and away from Douglas when he was eleven. Douglas stated that she "visited them a couple of times in Houston, but after a while I never went back. Every time I went they had no food, the neighborhood was drug infested, drugs in the home, and people with guns." Douglas also claimed that Wilbert is "mentally ill," extremely paranoid and practices witchcraft. "She would have candles and voo-doo stuff all over her home." According to Douglas, Wilbert had thrown Smith out of the house by the time Smith was fifteen and Smith was living on the streets of Houston. Bobby, Jerome and James Douglas, Jr., Smith's cousins, each individually stated that Wilbert neglected her children, beat them, and practiced voo-doo. James Douglas averred that Smith's family was the most dysfunctional he had ever witnessed. The clash between the affidavit of Joyce Jones and the statements of Smith and his family could lead a reasonable jurist to at least find

20

it debatable whether trial counsel adequately investigated Smith's background and were aware of his true upbringing.

The affidavits from Smith's family also contradict trial counsel's assertion that they extensively interviewed Smith's family members. Ron Mock, Smith's other trial counsel, claimed that he interviewed many of Smith's family members and childhood acquaintances. He stated that after evaluating all the witnesses, he decided to put just four people on the stand for the punishment phase of the trial. Joyce Jones, claimed that in preparation for Smith's trial they conducted an extensive investigation in which they "interviewed various witnesses including his family members, associates, sheriff's deputies, and his parole officer." She also claimed that they interviewed Smith on numerous occasions about his social, educational, employment, criminal, and health history. Nonetheless, Smith's brother Gilbert, sister Sabrina and grandmother all assert that they were not contacted by trial counsel even though they would have assisted if allowed.[3] The aforementioned cousins of Smith also contend that they were never contacted by trial counsel although they would have assisted in Smith's defense if allowed. Smith's mother states that she only talked to Smith's trial counsel for a total of 10 minutes right before she was to testify, and he only asked her questions about Smith's previous offenses.[4] Despite trial counsel's assertion that they extensively interviewed and contacted witnesses

---

[3] Smith has two brothers and two sisters. His sister Carolyn testified at trial. Gilbert and Sabrina state they were not contacted by trial counsel. Smith's last sibling, his brother George, was incarcerated, serving an extended prison term and it is not apparent whether he was ever contacted by trial counsel.

[4] Wilbert Smith stated in her affidavit that:

Roy's attorney Ron Mock did not come to my home. We had a brief 10-minute conversation over the phone. During the conversation with Mr. Mock he asked me a few questions about my son's past criminal history and why he got in trouble. Mock also asked me questions concerning the incident which my son was found guilty of

21

and family members, the only persons that Lisa Milstein, the mitigation specialist retained by federal habeas counsel, could confirm trial counsel contacted were the three persons presented at sentencing. In Rompilla, trial counsel *extensively* interviewed several of Rompilla's family members. 125 S. Ct. at 2462-63, 2472. Nonetheless, the Court found that trial counsel could not rely on their thorough interviewing of Rompilla and his family to excuse an unreasonable limitation to their investigation. Id. at 2466-67. The Court also found it inconsequential that Rompilla impeded trial counsel's investigation of mitigating evidence. Based on the numerous affidavits submitted by Smith's family, jurists of reason could find that it is debatable whether trial counsel adequately investigated Smith's family and social background. Such failure would be unreasonable in light of prevailing professional norms, Wiggins, 539 U.S. at 524, and in light of the fact that a defendant's background is unquestionably relevant to the jury's determination of whether a sentence less than death is warranted. Penry v. Lynaugh, 492 U.S. 302, 319 (1989).

Moreover, it is debatable among jurists of reason whether the scope of trial counsel's investigation was reasonable in light of the information that they did know. Trial counsel were aware from Smith that he had a long and extensive history of substance abuse. The evidence adduced established that Smith had been on a crack cocaine binge during the week previous to the murder, and that he had smoked 7 crack rocks the day of the offense. He also asserted that he could not remember committing the murder. Reasonable jurists could debate whether it was consistent with professional standards to not investigate the psychological and biological impact of Smith's substance abuse. The State asserts that such evidence could have a double edge sword quality such that it was

capital murder. The first time I met Ron Mock was outside the courtroom the day I testified. Mock told me that I was supposed to plead with jurors not to kill my son. Mock also asked me if I knew anything about some stolen watches.

22

a reasonable strategic decision not to present a psychiatric expert. However, "strategic choices made after thorough investigations of law and facts relevant to plausible options are virtually unchallengeable; [while] strategic choices made after less than complete investigations are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." Strickland v. Washington, 466 U.S. 668, 690-91 (1984) (emphasis added).

At sentencing, trial counsel's argument was based in part on a theory that Smith "was too high on coke during the offense for it to be deliberate." In that same vein, Smith testified at sentencing about his cocaine addiction, its influence upon his behavior, and his inability to remember parts of the evening the offense occurred due to his intoxication. Even though trial counsel's theory at sentencing was grounded on the contention that Smith's substance abuse affected his judgment, trial counsel did not investigate the effect Smith's substance abuse history could have had on him generally or specifically at the time of the offense. It is reasonably debatable whether trial counsel's failure to investigate this line of evidence rendered their investigation inadequate, particularly in light of trial counsel's defense theory and Smith's assertion that he did not remember the offense.[5] As in Wiggins where the Court held that trial counsel's awareness of Wiggins' troubled childhood would have prompted a reasonably competent attorney to investigate further, in the case at bar reasonable jurists

_____

[5] Dr. Paula Lundberg-Love, a psychologist who specializes in psycho-pharmacology–the study of the effects of drugs and alcohol upon an individual's cognitive functioning and behavior–asserts in her affidavit that based upon the information that Smith propounds concerning his substance abuse history it is highly likely that Smith has organic brain damage. Given Smith's chronic alcohol abuse and the reported level of consumption, Dr. Love averred that it is highly likely that Smith has suffered organic impairment that could have an effect on his behavior and cognitive understanding. She also asserts that Smith's history of crack cocaine probably influenced his understanding of right and wrong at the time of the offense, as well as his understanding of his rights when he later provided his written confessions. In addition, she asserted that the method in which Smith administered crack–inhalation directly into the lungs–likely caused a temporary delusional disorder, and the heavy abuse may have also disrupted his memory.

23

could debate whether in light of Smith's, his sister Carolyn's and his mother's testimony that Smith came from a disadvantaged background, a reasonably competent attorney would have investigated his background further.

Although failure to present mitigating evidence during the penalty phase is not *per se* ineffective assistance of counsel, counsel has a duty to make a reasonable investigation of defendant's case or to make a reasonable decision that a particular investigation is unnecessary. Ransom v. Johnson, 126 F.3d 716, 723 (5th Cir. 1997). Here, reasonable jurists could debate whether the investigation that supported trial counsel's strategy at sentencing was reasonable and adequate. If trial counsel's investigation was unreasonable then making a fully informed decision with respect to sentencing strategy was impossible. Wiggins, 539 U.S. at 527-28. As a result, the district court's and the state habeas court's decision to give deference to trial counsel's strategic decision would also be objectively unreasonable. Id. at 528.

In assessing whether Smith was prejudiced by trial counsel's conduct, the court should "reweigh the evidence in aggravation against the totality of the available mitigating evidence." Id. at 534. Here, trial counsel only presented the testimony of four people at sentencing. In light of the scant mitigation evidence presented, reasonable jurists could debate whether the evidence Smith now proffers would have convinced a juror that Smith was less morally culpable such that life imprisonment, rather than the death penalty, was appropriate. Because we conclude that Smith has established that reasonable jurists could find the district court erred in rejecting the underlying merits of Smith's claim and because, as previously stated, we find that the district court's procedural ruling is likewise debatable, we conclude that a COA should be issued.

II.     Jury Nullification Instruction

24

Smith's trial occurred in May 1990, a year after <u>Penry v. Lynaugh</u>, 492 U.S. 302 (1989) ("<u>Penry I</u>").  In response to <u>Penry I</u>, the state trial court submitted an instruction to the jury advising the jury, *inter alia*, to give effect to its consideration of mitigating evidence by submitting a negative answer to the special issues if the mitigation evidence sufficiently required the imposition of a life sentence.[6]  The supplemental instruction given in Smith case is identical to the supplemental

---

[6] In this case, the trial court instructed the jury as follows:

You are instructed that when you deliberate on the questions posed in the special issues, you are to consider all relevant mitigating circumstances, if any, supported by the evidence presented in both phases of the trial, whether presented by the State or the defendant.  A mitigating circumstance may include, but is not limited to, any aspect of the defendant's character, background, record, or circumstance of the crime which you believe could make a death sentence inappropriate in this case.  If you find that there are any mitigating circumstances in this case, you must decide how much weight they deserve, and thereafter, give effect and consideration to them in assessing the defendant's personal culpability, at the time you answer the special issue.  If you determine when giving effect to the mitigating evidence, if any, that a life sentence, as reflected by a negative finding on the issue under consideration, rather than a death sentence, is an appropriate response to the personal culpability of that defendant, then a negative finding should be given to that special issue under consideration.

The supplemental instruction given at Smith's trial is identical to the supplemental instruction denounced by the Supreme Court in <u>Penry v. Johnson</u>, 532 U.S. 782, 789-90 (2001):

"You are instructed that when you deliberate on the questions posed in the special issues, you are to consider mitigating circumstances, if any, supported by the evidence presented in both phases of the trial, whether presented by the state or the defendant. A mitigating circumstance may include, but is not limited to, any aspect of the defendant's character and record or circumstances of the crime which you believe could make a death sentence inappropriate in this case. If you find that there are any mitigating circumstances in this case, you must decide how much weight they deserve, if any, and therefore, give effect and consideration to them in assessing the defendant's personal culpability at the time you answer the special issue. If you determine, when giving effect to the mitigating evidence, if any, that a life sentence, as reflected by a negative finding to the issue under consideration, rather than a death sentence, is an appropriate response to the personal culpability of the defendant, a negative finding should be given to one of the special issues."

25

instruction later denounced by the Supreme Court in <u>Penry v. Johnson</u>. The jury affirmatively answered all three special issues.[7]

Smith contends that the supplemental instruction given to the jury violated his Eighth and Fourteenth Amendment rights because it did not provide an adequate vehicle for the jury to consider and give effect to Smith's mitigating evidence of drug addiction/intoxication, childhood poverty, and exposure to a crime-infested environment as a youth.

First, the district court addressed whether Smith's <u>Penry</u> claim was procedurally barred. Smith raised his argument on direct appeal to the Texas Court of Criminal Appeals. That court rejected Smith's claim because (a) the state court had previously approved of similar jury instructions in response to <u>Penry</u>, and (b) Smith failed to make a contemporaneous objection of egregious error to the court's charge. The district court found that the Texas Court of Criminal Appeals intermixed its procedural discussion with its merits resolution, and thus, the Texas Court of Criminal Appeals did not clearly and expressly rely on an independent state procedural bar in denying Smith's claim. Second, the district court addressed four areas of mitigating evidence presented by Smith: poverty; drug addiction and intoxication; character evidence; and growing up in a crime-ridden environment.

---

[7] The three special issues submitted pursuant to TEX. CODE CRIM. PROC. art. 37.071(b) (Vernon 1981) were as follows:

(1)    Was the conduct of the defendant, Roy Gene Smith, that caused the death of the deceased committed deliberately and with the reasonable expectation that the death of the deceased or another would result?

(2)    Is there a probability that the defendant, Roy Gene Smith, would commit criminal acts of violence that would constitute a continuing threat to society?

(3)    Was the conduct of the defendant, Roy Gene Smith, in killing the deceased unreasonable in response to the provocation, if any, by the deceased?

26

The district court held that Smith's mitigating evidence was not comparable to Penry I, and thus, the special issues provided the constitutionally mandated vehicle for jury consideration of the mitigation evidence. See Robertson v. Cockrell, 325 F.3d 243, 253 (5th Cir. 2003).

After the parties submitted their briefs in this appeal, the Supreme Court decided Tennard v. Dretke, 124 S. Ct. 2562 (2004), and Smith v. Texas, 125 S. Ct. 400 (2004). We ordered the parties to submit supplemental briefing, in light of the rulings in Tennard and Smith, but although the State complied with our order, Smith never filed a supplemental brief addressing Smith and Tennard.

In the State's supplemental briefing, the State argues that Smith and Tennard are fact specific applications of Penry I and Penry II, that do not affect this case. They contend that despite the presence of the constitutionally defective supplemental instruction, Smith is still required to show that the jury was prevented from giving effect to his mitigation evidence. The State asserts that Smith and Tennard do not affect this Circuit's prior jurisprudence that would support finding that Smith's evidence of an improvished background, growing up in a crime-infested environment and alcohol abuse can all be given effect through both the deliberateness and future dangerousness special issue questions. Additionally, the State argues that the definition of "deliberate" that was given with the instructions cures any deficiencies with the instruction.

The supplemental instruction given at Smith's trial is identical to the instruction that has been denounced by the Supreme Court on two occasions. See Penry II, 532 U.S. 782; Smith, 125 S. Ct. 400. "The Court has found a supplemental instruction, like the one present in [Smith's] trial, to be unconstitutional only where the special issue questions themselves are not broad enough to provide a vehicle for the jury to give effect to the defendant's mitigation evidence." Bigby v. Dretke, 402 F.3d 551, 570 (5th Cir. 2005) (citation omitted). "When the jury is able to consider and give effect

27

to the mitigation evidence in imposing sentence, the special issue questions are constitutionally adequate. Thus, in considering a Penry II claim, the court must ask whether the evidence is beyond the effective reach of the jury." Id. (citation omitted).

Smith's mitigation evidence that he asserts the jury could not give effect to was evidence of (1) addiction/intoxication, (2) childhood poverty, and (3) exposure to crime-infested environment. On cursory review, it would seem as though Smith's argument that his evidence of addiction/ intoxication was beyond the scope of the special issue questions is foreclosed by Circuit precedent. Smith took the stand at sentencing and explained that he was high on crack and under the influence of alcohol at the time of the murder and did not remember killing Whitmire. This Circuit has held that mitigation evidence of the defendant's intoxication at the time of the offense can be considered under the deliberateness question. See, e.g., Cordova v. Collins, 953 F.2d 167, 170 (5th Cir. 1992); Kelly v. Lynaugh, 862 F.2d 1126, 1133 (5th Cir. 1988). Smith also testified that he has had no behavioral problems when he was not under the influence of crack or alcohol. This Circuit has held that such evidence of addiction could be considered under the future dangerousness question. See, e.g., Cordova, 953 F.2d at 170. These cases do not seem to rely on the rejected constitutionally relevance test and therefore their holdings seem to be undisturbed by Tennard and Smith.

Arguably, Smith's claim that the jury could not consider evidence that he grew up in poverty and was exposed to a crime-infested environment as a child, is foreclosed by this Circuit's decisions that have denied Penry claims based upon a defendant's assertion that evidence of a troubled childhood was not within the special issue questions. However, the cases that have denied Penry relief for evidence of a troubled childhood seem to rely, in one way or another, on the now rejected constitutional relevance test. See, e.g., Davis v. Scott, 51 F.3d 457, 461-62 (5th Cir. 1995) (evidence

28

of troubled childhood, alone without demonstrating any link to the crime, does not constitute "constitutionally relevant mitigating evidence"); Madden v. Collins, 18 F.3d 304, 308 (5th Cir. 1994) (evidence of troubled childhood is not constitutionally relevant mitigating evidence when not attributable to the crime); Barnard v. Collins, 958 F.2d 634, 638-39 (5th Cir. 1992) (rejecting Penry claim where crime not "attributable" to the proffered evidence of troubled childhood). Contra Tennard, 124 S. Ct. at 2571 ("The Fifth Circuit was likewise wrong to have refused to consider the debatability of the Penry question on the ground that Tennard had not adduced evidence that his crime was attributable to his low IQ."); see also Robertson, 325 F.3d at 259 (Higginbotham, J., concurring) ("The majority dismisses the defendant's effort to push his evidence of mitigation into the Penry ring as contending for a categorical treatment of all child abuse. Fair enough; however. . . [w]e must be careful that this push not lead us to categorically exclude classes of mitigating evidence such as child abuse."). Because we have not addressed this issue since the Supreme Court's rejection of the constitutional relevance test, we find that Smith's Penry claim is debatable among jurists of reasons and we grant a COA.

Smith also has another hurdle in the form of In re Kunkle. In Kunkle, this court stated that "[a]ny reading of Smith as not being limited to mental impairment but rather reaching all types of mitigating evidence is inconsistent with [Jurek v. Texas, 428 U.S. 262 (1976), Graham v. Collins, 506 U.S. 461 (1993), Johnson v. Texas, 509 U.S. 350 (1993)]. We are not persuaded that the Court intended to undercut Jurek, Graham, and Johnson without even citing them. Whether Tennard or Smith sweep so broadly as to create a conflict with its own Jurek or Graham decisions is for the

Supreme Court." In re Kunkle, 398 F.3d 683, 685 (5th Cir. 2005).[8]  In order to assist this court in adjudicating the merits of Smith's Penry claim, he must directly address the precedents we have cited and how they affect the disposition of the merits of his claim.

III.    Claim for Funds under 21 U.S.C. § 848 for Assistance of a Psychologist

Following the denial of two ex parte motions for the assistance of a psychologist,[9] Smith filed his federal habeas application without the assistance of a psychologist to assist in the development and pleading of a claim focusing on mitigating evidence of Smith's mental state following his substance abuse.  The district court denied Smith's habeas writ, without granting an evidentiary hearing, rendering Smith's motion for expert assistance moot.

Under § 848(q)(4)(b):

---

[8] We note that the Supreme Court has never explicitly stated that Penry claims cannot be extended beyond claims involving evidence of "mental impairment." In fact at times, it seems the Court has said the exact opposite.  For example, in Smith v. Texas, the defendant put forward evidence of (1) organic learning disabilities and speech handicaps; (2) verbal IQ score of 75 and a full IQ score of 78; (3) his exemplary behavior at school despite his learning disabilities; (4) the involvement of his father with drugs and gang violence; and (5) Smith's young age of nineteen at the time he committed the crime.  In granting his Penry claim, the Supreme Court did not in any way highlight any particular piece of Smith's evidence.  The only mention the Smith Court made of whether the defendant's evidence was outside the reach of the special issue questions was the Court's single sentence that "[j]ust as in Penry II, petitioner's jury was required by law to answer a verdict form that made no mention whatsoever of mitigation evidence. And just as in Penry II, the burden of proof on the State was tied by law to findings of deliberateness and future dangerousness that had little, if anything, to do with the mitigation evidence petitioner presented."  125 S. Ct. 400, 407 (2004).

[9] The first ex parte motion was denied by the district court with leave to re-file upon providing further support for the need of an investigator.  Smith subsequently filed a second ex parte motion for the same claim, this time supported by affidavits by Smith and Dr. Paula Lundberg-Love, demonstrating the possibility that Smith's cognition at the time of the offense was impaired by the use of cocaine and alcohol.  The district court again denied Smith's motion with leave to re-file upon the Court's determination that Smith was entitled to an evidentiary hearing.

In any post conviction proceeding under section 2254 or 2255 of Title 29, seeking to vacate or set aside a death sentence, any defendant who is or becomes financially unable to obtain adequate representation or investigative, expert, or other reasonably necessary services *shall* be entitled to the appointment of one or more attorneys and the furnishing of such other services in accordance with paragraphs (5), (6), (7), (8), and (9).

(emphasis added).

Similarly, § 848(q)(4)(b) expressly incorporates § 848(q)(9):

Upon a finding that investigative, expert, or other services are reasonably necessary for the representation of the defendant, whether in connection with issues relating to guilt or the sentence, the court **may** authorize the defendant's attorneys to obtain such services on behalf of the defendant and, is so authorized, shall order the payment of fees and expenses therefor under paragraph (10) [Paragraph 10 provides that the court shall fix reasonable rates for reasonable expenses].

(emphasis added).

Smith contends that the district court erred in denying him funding for an expert psychologist under 21 U.S.C. § 848, which provides for funding for attorney, investigative, and expert assistance in post-conviction proceedings. Smith argues that he has a "mandatory right" to the assistance of a psychologist as long as he shows that he is indigent and that expert assistance is reasonably necessary. Fuller v. Johnson, 114 F.3d 491, 502 (5th Cir. 1997). Moreover, Smith contends that his need for a psychologist was reasonably necessary because such service would be necessary to permit his counsel to obtain evidence not yet acquired to support his ineffective assistance of counsel claim. McFarland v. Scott, 512 U.S. 849, 855 (1994). Specifically, the affidavit of Dr. Paula Lundberg-Love could show a valid basis to examine Smith's drug and alcohol use to determine whether it would support a defense mitigation theory. Smith's counsel would be unable to develop or investigate such evidence in the absence of a qualified expert.

31

The State counters with the authorization of investigative funds is within the discretion of the district court. See Fuller, 114 F.3d at 502. Moreover, the State argues that Smith's ineffective assistance of counsel claim was procedurally defaulted, thus Smith failed to demonstrate a reasonable necessity for further investigation of his claim.

This court has held that a COA is not necessary to appeal the denial of funds for expert assistance. Hill v. Johnson, 210 F.3d 481, 487 fn.3 (5th Cir. 2000). Therefore, because a COA is not necessary, this court's reviews orders involving § 848(q) for abuse of discretion. Id. at 487. This court has upheld the denial of such funding when a petitioner has (a) failed to supplement his funding request with a viable constitutional claim that is not procedurally barred Fuller, 114 F.3d at 502, or (b) when the sought-after assistance would only support a meritless claim, Hill, 210 F.3d at 476, or (c) when the sought after assistance would only supplement prior evidence. See Barazza v. Cockrell, 330 F.3d 349 (5th Cir. 2003).

Smith does not show an abuse of discretion here. The question of mental capacity, like in Barazza, was presented in this instance to the jury at trial. The jury heard testimony during the punishment phase from Smith that he used drugs and alcohol the day of the offense, as well as almost every day prior. Smith is now attempting to develop more evidence to support his claim of temporary insanity by introducing the affidavit of Dr. Love, to supplement his temporary insanity claim. Such supplemental evidence has been rejected by this court. See Chase v. Epps, 74 Fed. Appx. 339, 344 (5th Cir. 2003) (quoting Barazza, 330 F.3d at 352) (rejecting a section 848(q) claim where mental capacity had been presented to the jury and "petitioner was not attempting to supplement, if not contradict, the expert testimony rejected by the jury"). The testimony of Dr. Love would supplement the prior testimony of Smith during the punishment phase — that Smith had constantly ingested

32

alcohol and cocaine prior to the offense — of which the jury has already been made aware. Therefore, the district court judge did not abuse his discretion in rejecting the allocation of funds for the development of supplemental evidence.

Moreover, even if Smith can show "reasonable necessity," the granting of funds under section 848(q) is a discretionary decision to which Smith does not have a mandatory right. In 1996, the AEDPA section 108 changed section 848(q)(9) *inter alia* "changing the mandatory 'shall' language to the discretionary 'may.' AEDPA § 108, Pub. L. No. 104-32, 110 Stat. 1226 (1996); Fuller, 114 F.3d at 502. Here, the district court decided Smith's habeas petition post-1996, and thus AEDPA applies. The language of section 848(q)(9) states that upon a finding that an expert is "reasonably necessary . . .the court may authorize" the granting of funds. Thus, the change from 'shall' to 'may' therefore can only reasonably be construed as changing a mandatory granting of funds to a discretionary granting of funds even if the reasonable necessity language is complied with. The district court judge did not abuse his discretion in denying the grant of funds.

<u>Conclusion</u>

For the reasons outlined above, Smith's request for a COA is GRANTED as to his ineffective assistance of counsel claim and his Penry claim. The district court decision to deny the grant of funds for an expert under § 848 is AFFIRMED.