# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 14-70037

SCOTT LOUIS PANETTI,

> Petitioner - Appellant

v.

LORIE DAVIS, DIRECTOR, TEXAS DEPARTMENT OF CRIMINAL JUSTICE, CORRECTIONAL INSTITUTIONS DIVISION,

> Respondent - Appellee

United States Court of Appeals
Fifh Circuit

**FILED**

July 11, 2017

Lyle W. Cayce
Clerk

Appeal from the United States District Court
for the Western District of Texas

Before STEWART, Chief Judge, and HIGGINBOTHAM and OWEN, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

Our question today is competency to be executed and its attending procedures, not the validity of the conviction or sentence. We stayed execution to consider Scott Panetti's appeal from the denial of appointed counsel and funding to hire a mental health expert and investigator. We will now reverse the district court's denial of appointed counsel and expert funding under 18 U.S.C. § 3599, vacate its factual findings relating to Panetti's competency, and remand for additional proceedings, another chapter in this judicial plunge into

## No. 14-70037

the dark forest of insanity and death directed by the flickering and inevitably elusive guides.

## I

Charged with capital murder for killing his wife's parents in front of his wife and three-year-old daughter, Panetti insisted on representing himself at trial, an undertaking made the more difficult by a long history of schizophrenia and institutionalization. The Texas Court of Criminal Appeals ("TCCA") upheld his conviction and death sentence on direct and collateral review.[1]

Panetti filed his first federal habeas petition in 1999, claiming, among other things, that he was incompetent both to waive counsel and to stand trial. The district court rejected those incompetency claims, and the state trial court set Panetti's execution date for February 5, 2004.[2] In December 2003, Panetti filed a motion in state court under Article 46.05 of the Texas Code of Criminal Procedure, claiming for the first time he was incompetent to be executed.[3] The state court denied the motion without a hearing, and the TCCA dismissed his appeal for lack of jurisdiction.[4]

In January of 2004, Panetti filed a second federal habeas petition, his first under *Ford v. Wainwright*.[5] The federal district court granted his request for a stay to allow the state court to consider supplemental evidence.[6] The state court hired two experts to evaluate Panetti, but upon receipt of their reports, denied relief without an evidentiary hearing.[7] Finding that the state court's

---

[1] *Panetti v. State*, No. AP-72,230 (Tex. Crim. App. Dec. 3, 1997) (unpublished); *Ex parte Panetti*, No. WR-37,145-01 (Tex. Crim. App. May 20, 1998) (unpublished).

[2] *Panetti v. Quarterman*, 551 U.S. 930, 937 (2007).

[3] *Id.* at 938.

[4] *Id.*

[5] 477 U.S. 399 (1986) (holding that the Eighth Amendment bars states from executing insane prisoners).

[6] *Panetti v. Dretke*, 401 F. Supp. 2d 702, 704 (W.D. Tex. 2004).

[7] *Id.*

No. 14-70037

failure to afford Panetti a hearing denied due process under *Ford*, the federal district court scheduled an evidentiary hearing to determine Panetti's competency to be executed, appointed counsel, and authorized funds for investigative and expert assistance.[8] Ultimately, the district court concluded that Panetti understood the reason for his execution and found him competent to be executed.[9] We affirmed.[10]

The Supreme Court granted certiorari and reversed.[11] The Court reasoned that "a prisoner's recognition of the severity of the offense and the objective of community vindication are called into question . . . if the prisoner's mental state is so distorted by a mental illness that his awareness of the crime and punishment has little or no relation to the understanding of those concepts shared by the community as a whole."[12] The Court held that the test this court deployed—a prisoner's factual awareness of his impending execution and the State's articulated premises for executing him—did not go far enough; that a prisoner must also have a "rational understanding" of the State's reasons for executing him.[13] The Court remanded the case to the district court to investigate and determine whether Panetti's delusions rendered him incapable of understanding the reason for his punishment in light of its opinion and against the backdrop of *Roper v. Simmons*,[14] *Atkins v. Virginia*,[15] and *Ford*.[16]

---

[8] *Id.* at 705.

[9] *Id.* at 712.

[10] *Panetti v. Dretke*, 448 F.3d 815 (5th Cir. 2006).

[11] *Panetti v. Quarterman*, 551 U.S. at 960.

[12] *Id.* at 958-59.

[13] *Id.* at 960.

[14] 543 U.S. 551 (2005) (holding that it is unconstitutional to impose capital punishment for crimes committed under the age of 18).

[15] 536 U.S. 304 (2002) (holding that the execution of persons with intellectual disabilities is cruel and unusual).

[16] *Panetti v. Quarterman*, 551 U.S. at 962.

No. 14-70037

So, the federal district court held a second evidentiary hearing on the issue of Panetti's competency to be executed. The court thoroughly reviewed the evidence presented at the hearing and concluded that he was competent under the correct standard.[17] While Panetti's resulting appeal to this court was pending, the Supreme Court held in *Indiana v. Edwards* that "the Constitution permits States to insist upon representation by counsel for those competent enough to stand trial . . . but who still suffer from severe mental illness to the point where they are not competent to conduct trial proceedings by themselves."[18] In turn, we granted Panetti's motion to stay federal proceedings for his return to Texas state court with his new *Edwards* claim.

Panetti then filed another state habeas petition, which the TCCA dismissed on October 21, 2009, as a subsequent application for "fail[ing] to meet the dictates of Article 11.071, § 5."[19] The next day, with our permission, Panetti filed his third federal habeas petition in the district court.[20]

While that petition was pending, the TCCA addressed the meaning of *Edwards* in *Chadwick v. State*.[21] In light of *Chadwick*, the federal district court granted Panetti leave to file a second successive state habeas petition.[22] The TCCA again dismissed the petition, and the Supreme Court denied certiorari.[23] Panetti then returned to the federal district court with his *Edwards* claim,

---

[17] *Panetti v. Quarterman*, No. A-04-CA-042-SS, 2008 WL 2338498, at *37 (W.D. Tex. Mar. 26, 2008).

[18] 554 U.S. 164, 178 (2008).

[19] *Ex parte Panetti*, No. WR-37,145-02, 2009 WL 3368707 at *1 (Tex. Crim. App. Oct. 21, 2009) (unpublished); *see also* TEX. CODE CRIM. PROC. ANN. art 11.071, § 5 (West 2016).

[20] *Panetti v. Thaler*, No. A-09-CA-774-SS, 2012 WL 290115, at *2 (W.D. Tex. Jan. 31, 2009).

[21] 309 S.W.3d 558 (Tex. Crim. App. 2010) (holding that the evidence in that case supported implied findings of fact that defendant's mental illness was severe enough to render him incompetent to proceed pro se).

[22] *Panetti v. Thaler*, 2012 WL 290115, at *2.

[23] *Ex parte Panetti*, No. WR-37,145-03, 326 S.W.3d 615 (Tex. Crim. App. 2010) (mem. op.); *Panetti v. Texas*, 564 U.S. 1023 (2011) (mem. op.).

No. 14-70037

which the court denied on the merits.[24] On August 21, 2013, this court affirmed both the district court's 2008 rejection of Panetti's competency-to-be-executed claim and its 2012 rejection of Panetti's *Edwards* claim.[25] The Supreme Court denied Panetti's resulting petition for a writ of certiorari.[26]

## II

We come to Panetti's present claim. Acting on an *ex parte* request from the state district attorney's office, the state court set Panetti's execution for December 3, 2014. Panetti's counsel learned of the execution date from a newspaper on October 30, and the next day filed an emergency motion for a hearing, asking that the execution date be withdrawn or modified to allow time to pursue the issue of his competency to be executed through an Article 46.05 motion.[27] In this motion, Panetti argued that in the short time remaining before his execution date, he would not have "a meaningful opportunity to contest his competency for execution" as required by due process and *Ford*. In Texas in 2014, no notice was required to be provided to capital defendants or their counsel when the execution was set, and dates of execution for "subsequent" executions could be set as early as thirty-one days out from the order scheduling the execution.[28]

Panetti also submitted related motions for counsel and funding for expert assistance, captioned "Defendant's Ex Parte Motion for Funds to Hire Mental Health Expert to Assist Defense in Article 46.05

---

[24] *Panetti v. Thaler*, 2012 WL 290115, at *82.

[25] *Panetti v. Stephens*, 727 F.3d 398 (5th Cir. 2013).

[26] *Panetti v. Stephens*, 135 S. Ct. 47 (2014) (mem. op.).

[27] *Panetti v. State*, No. AP-77,049, 2014 WL 6764475, at *1 (Tex. Crim. App. Nov. 25, 2014) (unpublished).

[28] TEX. CODE CRIM. PROC. ANN. art. 43.141(c) (West 2003). At the next legislative session, before oral argument in this case, the Texas legislature corrected this deficiency, requiring notice to capital defendants and requiring all executions be set a minimum of ninety-one days out. Act of May 29, 2015, 84th Leg., R.S., ch. 951, 2015 Tex. Sess. Law Serv. 951 (West).

No. 14-70037

Proceedings," "Defendant's Ex Parte Motion for Funds to Hire Investigator to Assist Defense in Article 46.05 Proceedings," and "Defendant's Motion for Appointment of Counsel to Prepare and Litigate Article 46.05 Motion." He argued that the State "must comport with the minimum due process guarantees enumerated in *Ford*" by granting him compensated counsel, funding for experts, and time to develop an Article 46.05 petition; that with these resources, he would be able to make the substantial showing of incompetence required by Article 46.05 for a hearing on his competency. The motions included the names of experts Panetti's pro bono counsel had already contacted, describing their qualifications and anticipated expenses. In the meantime, the State began gathering evidence in support of its opposition to Panetti's pleas. This included surreptitiously recording a conversation between Panetti and his parents on November 4, as it had done seven years before, generating evidence of the same type relied upon by the federal district court in denying Panetti's earlier *Ford* claim.

On November 6, the state trial court held a hearing by phone with both parties. During this teleconference, Panetti's counsel reminded the court that Panetti had only six days to file or he would lose any right to appeal from the judgment of the state court;[29] that Panetti's competency had not been evaluated for seven years; and that the state trial court was placing his unpaid counsel in the position of either attempting to review 8,500 pages of TDCJ medical records, seek pro bono expert assistance, and prepare and file a petition in less than one week's time, or else lose all right to appellate review. The court suggested, and the State agreed, that Panetti file a skeletal Article

---

[29] S*ee* TEX. CODE CRIM PROC. ANN. art. 46.05(l-1) ("[T]he court of criminal appeals may not review any finding of the defendant's competency made by a trial court as a result of a motion filed under this article if the motion is filed on or after the 20th day before the defendant's scheduled execution date.").

No. 14-70037

46.05 petition, followed by an amended motion expanding on the original petition, provided any additional filings were submitted by November 21, effectively granting an additional nine days. Panetti's counsel replied that fifteen days were not enough for a law professor from Wisconsin and an expert, both without funding and with the large demands of their primary work, to prepare sufficient filings.

Later that day, the court denied Panetti's emergency motion for a hearing. On November 14, Panetti filed a "Renewed Motion to Stay or Modify Execution Date, Appoint Counsel, and Authorize Funds for Investigative and Expert Assistance to Provide Meaningful Opportunity to Prepare Article 46.05 Motion," in which he argued that he could not, facing these time constraints and absent mental health expert resources, meet the threshold requirement of Article 46.05.[30] In the renewed motion, pro bono counsel included the limited evidence that he had been able to obtain, without any funding, to substantiate the claim of present incompetency. The renewed motion included the expert opinion of Dr. Diane Mosnik, a neuropsychologist with extensive experience in the area of schizophrenia. As Dr. Mosnik was to help pro bono counsel on a "limited basis," she was only able to give her opinion on the basis of a preliminary review of Panetti's records. With this limited review, she determined that Panetti had exhibited worsening signs of acute psychosis in the year prior. Counsel cited Panetti's prison medical records, observing what he believed were "alarming and aberrational changes in Mr. Panetti's behavior over the last two years." Counsel argued that he needed to be appointed and granted funds to retain Dr. Mosnik to develop these preliminary impressions.

The renewed motion also iterated Panetti's argument that *Ford* and due process entitled him to compensated counsel and funding for experts as he

---

[30] *See Panetti v. State*, 2014 WL 6764475, at *1.

developed his Article 46.05 motion. He argued that, without these resources, "the state-court process [would] be ineffective to protect Mr. Panetti's . . . rights" under *Ford* and *Panetti*. Panetti argued that, while *Ford* does not require the State to appoint counsel and provide funding in every situation, once a prisoner makes "a colorable showing of incompetency," it does require the State to provide the "rudimentary procedural due process protections" that he sought. Panetti's pro bono counsel maintained that he had made such a showing, but were being deprived of the means to show more. The court denied the renewed motion, and Panetti appealed to the TCCA.

Meanwhile, the State's lawyers secured the assistance of Dr. Joseph Penn, Director of Mental Health Services in the Correctional Managed Care division of the University of Texas Medical Branch.[31] By November 24, 2014, Dr. Penn had completed his work and signed an affidavit describing Panetti's prison medical records, giving his interpretation of the record regarding the significance of the pattern of medical treatment—both what had been provided and what had not. He never met with Panetti. The State filed this affidavit with the TCCA, and later with the federal district court, along with the November 4 recording of Panetti and his family.

On November 25, in a 5-4 opinion, the TCCA affirmed the denial of Panetti's motions.[32] It ruled that it lacked jurisdiction to review them because the motions did not qualify as Article 46.05 pleadings and suggested that, even construed to qualify, they were untimely.[33] Within four months of that decision, legislation was introduced in the Texas Senate to require in all future capital cases the notice that Panetti was not given and to extend the time that

---

[31] Dr. Penn is board certified in both general and forensic psychiatry. His Curriculum Vitae demonstrates that he has served as an expert witness regularly since 1996.

[32] *Panetti v. State*, 2014 WL 6764475, at *1.

[33] *Id.*

capital defendants and their counsel have to prepare filings.[34] That bill became law just before oral argument in this case.[35]

Reaching the federal courts, Panetti on November 25, 2014, filed a motion for stay of execution and sought appointment of counsel and funding for expert assistance under 18 U.S.C. § 3599, again urging that *Ford* and due process mandated that he have time and these resources. On November 26, 2014, the Wednesday before Thanksgiving, the State filed its "Opposition to Petitioner's Motion for Stay of Execution," which responded to all of Panetti's motions, including the motions for counsel and funding for experts. The State's opposition relied on Dr. Penn's affidavit and the audio recording of Panetti and his family, including them as exhibits.[36] Later that day, the court denied Panetti's motions for want of an adequate showing of incompetence. It concluded that Panetti failed to show that his mental health had substantially changed since the court's detailed inquiry seven years earlier. It did not address the State's argument that any habeas claim of Panetti's was procedurally barred, and hence did not address Panetti's pleas for time. Panetti timely appealed to this court. We stayed his execution for briefing and argument.

## III

Panetti requests appointment of counsel and funding for expert assistance as provided in 18 U.S.C. § 3599(a)(2):

> In any post conviction proceeding under section 2254 or 2255 of title 28, United States Code, seeking to vacate or set aside a death sentence, any defendant who is financially unable to obtain

---

[34] Tex. S.B. 1071, 84th Leg., R.S. (2015) (introduced March 9, 2015).

[35] TEX. CODE CRIM. PROC. ANN. art. 43.141(b-1), (c) (West 2016) (effective September 1, 2015).

[36] The State successfully employed similar evidence eight years ago, when it presented a prison-taped audio recording of Panetti with his family to the same federal district court judge. In then rejecting Panetti's *Ford* claim, the district court quoted directly from that tape.

No. 14-70037

adequate representation or investigation, expert, or other necessary services *shall be entitled* to the appointment of one or more attorneys . . . .[37]

These statutory rights may be invoked before a habeas petition is filed. Congress contemplated that the prisoner on death row would have the assistance of paid counsel to prepare a federal habeas petition.[38] The entitlement to paid counsel is absolute, subject to a narrow exception, when potential procedural bars would "indisputably" foreclose habeas relief.[39] To deny appointment of counsel, it must be "plain that any subsequent motion that [appointed] counsel might file . . . would be futile;"[40] that is, the work of paid, able counsel, with funds to engage experts, could make no difference. Panetti's request does not fit within this narrow exception.

The State argues that Panetti is procedurally barred because he failed to exhaust his *Ford* claims in state court under Article 46.05. Panetti replies that courts may excuse exhaustion where, as applied here, the applicable state procedures provided inadequate due process protections under *Ford*, leaving only repair to federal court.

Panetti argues that the actions of the State here combined to render Article 46.05 ineffective to protect his rights. The State *ex parte* requested an execution date without notice to Panetti's counsel, leaving them with only ten days between learning of the impending execution and the deadline to file a motion under Article 46.05 or lose all right of appeal from the state trial court's

---

[37] 18 U.S.C. § 3599(a)(2) (emphasis added).

[38] *See McFarland v. Scott*, 512 U.S. 849, 855-56 (1994).

[39] *Cantu-Tzin v. Johnson*, 162 F.3d 295, 300 (5th Cir. 1998). Other courts have termed this limitation as one in which relief is "clearly" foreclosed or whether appointment of counsel would "be a wholly futile gesture." *Chavez* v. *Sec'y, Fla. Dept. of Corr.*, 742 F.3d 940, 946 (11th Cir. 2014).

[40] *Christeson* v. *Roper*, 135 S. Ct. 891, 895 (2015). In that case, the Court recognized that "Christeson faces a host of procedural obstacles to having a federal court consider his habeas petition." *Id.*

10

judgment.[41] The state court judge suggested that Panetti file a skeletal petition, followed by an amended motion expanding on the original petition. Meanwhile, the State used its own resources to seek out and file new evidence with the TCCA, all while opposing Panetti's access to the same resources.

A divided TCCA, in turn, dismissed Panetti's amended motion as neither timely filed nor a proper Article 46.05 motion. The four dissenting judges agreed with Panetti, deeming the court's treatment of Panetti's claims "overly formalistic" and believing that it "at best, deprive[d] [him] of a fair opportunity to litigate his claims, thereby violating the constitutionally required procedural protections recognized in *Ford*."[42] The dissent argued that the TCCA should have accepted jurisdiction over Panetti's renewed motion, for his original motion sought relief by the only pathway offered under Texas law, Article 46.05, and "was timely filed."[43] The court had recently done just that in *Druery v. State*.[44] In response to the majority's conclusion that Panetti had not in fact filed an original Article 46.05 motion, the dissent pointed out that the court ought to have properly exercised its jurisdiction because his motions were "intertwined with the substance of relief sought by Article 46.05."[45] In short, four justices maintained that the majority ignored its own precedent allowing the TCCA to consider such intertwined claims.[46]

---

[41] TEX. CODE CRIM PROC. ANN. art. 46.05(l-1) ("[T]he court of criminal appeals may not review any finding of the defendant's competency made by a trial court as a result of a motion filed under this article if the motion is filed on or after the 20th day before the defendant's scheduled execution date.").

[42] *Panetti v. State*, 2014 WL 6764475, at *1 (Alcala, J., dissenting).

[43] *Id.*

[44] 412 S.W.3d 523, 536 (Tex. Crim. App. 2013) (permitting review of both Article 46.05 competency motion and supplement to that motion, when only original motion was timely filed for purposes of twenty-day rule).

[45] *Panetti v. State*, 2014 WL 6764475, at *1 (Alcala, J., dissenting).

[46] *See Staley v. State*, 420 S.W.3d 785, 787 (Tex. Crim. App. 2013) (concluding that it had jurisdiction to review merits of collateral involuntary-medication order that was "intertwined" with trial court's ruling that defendant was competent to be executed). Rules

No. 14-70037

Texas's application of Article 46.05 to Panetti denied him due process. That procedure, at least as applied to him, was ineffective to protect his right to be free from cruel and unusual punishment under *Ford* and its progeny. Texas itself has recognized as much by recently passing legislation to ensure that no other capital defendant is placed in the situation that Panetti and his counsel faced.[47] That initiative commendably addresses the core concern going forward, but does not address the denial here.

Ordinarily, a state prisoner must exhaust all of his state remedies to be entitled to habeas review.[48] But where "circumstances exist that render [the state] process ineffective to protect the rights of the applicant," we are empowered to reach those claims absent exhaustion.[49] We find that such circumstances exist here. Federal courts also ordinarily apply a deferential standard of review to the claims of state prisoners seeking habeas relief.[50] But where, as here, the state courts have not reached the merits of a petitioner's claims, federal courts will review *de novo*.[51] We are not prepared to make the predictive judgment, absent a procedural bar to federal review and with no AEDPA deference to a decision of the state court, that Panetti's federal habeas claim would be futile. He is entitled to counsel to pursue that claim, and its denial was error.

---

that are not thoroughly and consistently applied are not procedural bars to federal jurisdiction. *Ford v. Georgia,* 498 U.S. 411, 423-24 (1991) ("[O]nly a 'firmly established and regularly followed state practice' may be interposed by a State to prevent subsequent review by this Court of a federal constitutional claim.").

[47] *See* Tex. S.B. 1071, 84th Leg., R.S. (2015) ("An act relating to requiring notice of the scheduling of an execution date and the issuance of a warrant of execution.").

[48] 28 U.S.C. § 2254(b)(1)(A) (2012).

[49] *Id.* § 2254(b)(1)(B)(ii).

[50] *Id.* § 2254(d).

[51] *See Cone v. Bell,* 556 U.S. 449, 472 (2009) ("Because the Tennessee courts did not reach the merits of Cone's Brady claim, federal habeas review is not subject to the deferential standard that applies under AEDPA . . . . Instead, the claim is reviewed *de novo*."); *Hoffman v. Cain,* 752 F.3d 430, 437 (5th Cir. 2014) ("For claims that are not adjudicated on the merits in the state court, we apply a *de novo* standard of review.").

No. 14-70037

Nor do we see justification for denying Panetti funding for experts and other investigative resources.[52] Under 18 U.S.C. § 3599(f), the court "may authorize the defendant's attorneys to obtain such services on behalf of the defendant" upon "a finding that investigative, expert, or other services are reasonably necessary for the representation of the defendant." A district court may deny an inmate's request for funds to pursue federal habeas relief "when a petitioner has (a) failed to supplement his funding request with a viable constitutional claim that is not procedurally barred, or (b) when the sought-after assistance would only support a meritless claim, or (c) when the sought-after assistance would only supplement prior evidence."[53]

The federal district court did not mention the statutory standard of "reasonabl[e] necess[ity]," but implicitly found that Panetti had not met it in holding that, "[c]onsidering . . . the wealth of evidence on the issue of Panetti's competency," his "attempt to begin the cycle of litigation afresh should be rejected." The reality is that a decade has now passed since the last determination of whether this concededly mentally ill petitioner is competent to be executed.[54] Given that lapse of time, we cannot say that any new evidence would only be "supplemental" to that already contained in the record.

---

[52] *See Brown v. Stephens*, 762 F.3d 454, 459 (5th Cir. 2014) (citing *Woodward v. Epps*, 580 F.3d 318, 334 (5th Cir. 2009) and *Smith v. Dretke*, 422 F.3d 269, 288 (5th Cir. 2005)).

[53] *Smith,* 422 F.3d at 288 (citations omitted) (addressing request for funds to obtain the assistance of an expert psychologist in federal habeas proceedings).

[54] The State directs us to an unpublished case, *Charles v. Stephens*, where we affirmed the district court's denial of funding for experts because of the underlying lack of merit of Charles's *Ford* claim. 612 F. App'x 214 (5th Cir. 2015) (unpublished), *cert. denied*, 135 S. Ct. 2075 (2015). We note several important distinctions from this case. First, unlike Panetti, Charles had paid counsel. *Id.* at 216 n.3. ("The district court granted Charles's motion to appoint counsel and this decision is not at issue on appeal.") Second, while Panetti's competency has been at issue since his trial, Charles raised the question of competency for the first time two months before his scheduled execution, *id.* at 216, which, as we observed, gives rise to the inference that Charles was making the "the kind of '[l]ast-minute filings that are frivolous[,] designed to delay executions[, and] can be dismissed in the regular course."

No. 14-70037

As Justice Powell wrote in *Ford*, due process is breached when "affected parties" are prevented "from offering contrary medical evidence or even from explaining the inadequacies of the State's examinations."[55] Panetti asserts that the State here sought to deny him a meaningful opportunity to do just that. It deployed its able death penalty lawyers, aided by a medical expert, Dr. Penn, and recorded Panetti with his family—filing Dr. Penn's affidavit and the recording with both the TCCA and federal district court.[56] Meanwhile, Panetti lacked the funds to acquire his own up-to-date evidence; his last professional competency evaluation was conducted a decade ago. As the argument goes, it is one thing to respond to a petitioner's claims on the existing record; it is quite another, with assistance of counsel and paid experts, to generate new evidence while preventing the petitioner from doing the same. All this without initially notifying Panetti of his impending execution, resulting in an impossible deadline—a flaw that has since been ameliorated by the Texas legislature to provide notice and time for these sorts of claims to be developed. As the Court recently reminded in *Moore*, "[t]he clearest and most reliable objective evidence of contemporary values comes from state legislative judgments" because it is those bodies that "are constituted to respond to the will and consequently the moral values of the people."[57] In introducing the bill to require notice to defendants whose execution dates are set and the provision of enough time to prepare a defense, the authoring Texas Senator said:

---

*Id.* at 222 (quoting *Panetti v. Quarterman,* 551 U.S. at 946). Third, as discussed *supra*, and unlike in *Charles*, the State here took an adversarial posture towards Panetti's motions.

[55] *Ford*, 477 U.S. at 424 (Powell, J. concurring).

[56] The State made sure to include the recording it had made because it was the same kind of evidence that had previously persuaded the district court to find Panetti competent to be executed—lending further support to the conclusion that the State behaved adversarially.

[57] *Moore v. Texas*, 137 S. Ct. 1039, 1056 (2017) (quoting *Atkins v. Virginia*, 536 U.S. 304, 312 (2002) and *Gregg v. Georgia*, 428 U.S. 153, 175 (1976)) (internal quotation marks omitted).

14

No. 14-70037

> Attorneys for capital defendants should have the same notice as the state and the court about when executions will be set. Requiring sufficient notice of the scheduling of execution dates will ensure that defendants have an opportunity to fairly prepare for the impending execution.[58]

We agree.

With the benefit of time and argument, we must conclude that the district court's conclusion was tainted by the inadequate due process protection provided to Panetti by the State. We need not and do not treat the merits of Panetti's claim that he is incompetent to be executed—that is for the district court after Panetti has been afforded the opportunity to develop his position. We conclude that the district court abused its discretion in denying Panetti funding for counsel and for experts to assist in preparing his contemplated federal habeas petition. To the extent the district court made findings of fact regarding Panetti's competency to be executed, they must be vacated. It is the case that a petitioner bringing claims under *Ford* and the State crafting a response must travel in uncharted water—uncertainties for all. This opinion does not undertake to resolve these uncertainties; it rather insists that their resolution proceed with fully armed counsel on both sides—the essence of due process.

## IV

The dissent argues that Texas's adversarial posture played no role in the decisions of the Texas Court of Criminal Appeals or the federal district court because those courts did not rely on the evidence the State produced. With respect, the dissent's observation that the TCCA "did not reach the merits of Panetti's claim" misses the point. The very question which divided that court 5-4 was whether Panetti's struggle to comply with the strictures of Article

---

[58] Senate Research Center, Bill Analysis, Tex. S.B. 1071, 84th Leg., R.S. (2015).

15

46.05, without funded counsel or expert assistance and with truncated deadlines, was sufficient in the face of the State's decidedly adversarial opposition. The point made by the dissenting judges was that the court ought to accept the pleading despite these shortcomings because Panetti could not "attach items in support of a motion under Article 46.05 due to a lack of funds to obtain assistance from mental-health experts whose opinions are required to make a substantial showing under the article;" and that his argument was, at the least, "intertwined with the substance of the relief sought by Article 46.05."[59] And none of this can change the reality that the TCCA majority, while ignoring its own precedent, faulted Panetti's request for relief for deficiencies that were themselves a product of the State-created plight faced by Panetti's counsel, all with a backdrop of reassuring comfort tendered by the State's medical expert that nothing had changed in Panetti's competency. And the district court, whose decision is before us on appeal, in rejecting Panetti's claim on the merits, stated that it had considered "the wealth of evidence on the issue of Panetti's competency." While that basis for conclusion surely included all of the State's last-minute submissions, it was without the benefit of evidence that Panetti sought to produce by process denied to him.

The dissent further argues that any shortcomings of the state court process were made harmless by the intervening ruling of the federal district court; that the same court that had earlier denied Panetti's *Ford* claim was well-equipped to decide whether Panetti had overcome the presumption of competence attendant to that 2008 ruling. This argument fails. On November 19, 2014, the Texas State trial court rejected Panetti's renewed motion, which contained the evidence that Panetti's unfunded counsel had been able to

---

[59] *Panetti*, 2014 WL 6764475. The court had done just that in *Druery*. *Id.*; *see Druery v. State*, 412 S.W.3d 523, 536 (Tex. Crim. App. 2013).

assemble up to that point. Six days later, on November 25, 2014, the TCCA affirmed that decision. That same day, Panetti filed in the federal district court his motion for a stay, appointment of counsel, and funding for experts, with Texas opposing.

The district court in turn did not confront the issue of exhaustion of state remedies posed by the decision of the TCCA. Pressed by the looming execution date, it elected to proceed to the merits, as it was entitled to do. Doing so, however, did not address Panetti's pleas that the state had denied him the time and resources required to present his claim—resources that the state was deploying against him. This left the district court to weigh Panetti's stunted submission against the state's evidence of Dr. Penn's affidavit and the recording of Panetti and his family and his experience in the earlier competency proceedings.[60] The result was nigh inevitable. Rather than a cleansing of error, as the dissent has it, the district court did not remedy the denial of due process we have described. Instead, it proceeded upon the flawed record that denial produced.

## V

Finally, lest the length and complexity of Panetti's path in the federal courts be seen as a sane man playing the system, we remind that there can be no dispute that Panetti is mentally ill, and was so long before his crime. Before his conviction, he had been "hospitalized numerous times" and prescribed medication that "would be difficult for a person not suffering from extreme psychosis even to tolerate."[61] In 1986, Panetti's then-wife sought judicial relief from the Texas state courts after Panetti "became convinced the devil had

---

[60] "The Court finds, considering the question in light of the wealth of evidence on the issue of Panett's competency previously amassed in this case . . . ."

[61] *Panetti v. Quarterman*, 551 U.S. at 936.

17

possessed their home and . . . had buried a number of valuables next to the house and engaged in other rituals."[62]

Seven years have passed since he was last adjudged competent. Since then, as recounted by the amici: (1) escorting officers have noticed that Panetti often acts in an irrational and delusional manner; (2) despite having refused mental health treatment for nearly two decades, Panetti has, in the last few years, begun requesting mental health assistance and medication; (3) Panetti has expressed the belief that Texas has implanted a listening device in his tooth that sends command messages to his brain; (4) Panetti reads the Gospel to help drown out the voices he hears; (5) Panetti has expressed the belief that CNN anchor Wolf Blitzer displayed Panetti's stolen TDCJ ID card during a report; and (5) Panetti has claimed to be the father of actress and singer Selena Gomez.

Nor does Panetti present as a poster child of abuse—seeking a determination of competence with each setting of an execution date. Panetti is from a small universe of death row prisoners; he has a long history of mental illness that predates his crime and following a judicial determination of his competency to be executed, he experienced a delay of another decade of solitary, brought about by a wholly extraneous issue that itself was resolved by the Supreme Court.

Process matters, and gives rise to the aged observation that, in the law, the shortest distance between two points is seldom a straight line. Truncated hearings and exacting strictures can squeeze the life from due process, while perversely creating years of delay, all for a refusal to give a few days of time— this most seriously so when the issue is not *whether* a defendant is mentally ill, but the more subtle reaches of his disability. There is no justification for

---

[62] *Id.*

18

executing the insane, and no reasoned support for it, as only a glance at the brief of amici—filed by able and fervent citizens spanning the spectrum of political views—will confirm. We and our state court brethren struggle to get it right, an effort not always successful, for we yet are just lawyers, subject to error. Mr. Wiercioch has, in our best traditions, served his client for years with limited resources and time. To refuse to give him the time and resources critical to review Panetti's present condition is error, borne of understandable but nevertheless error-producing frustration over the delay baked into our death penalty jurisprudence—with its twists and turns between two sovereigns. The core deficiencies underlying our finding of denial of due process have commendably been alleviated by the Texas legislature, but stopping there leaves Panetti in the dust.

We reverse the district court's denial of appointed counsel and expert funding. We vacate, as premature, the district court's findings on the merits of Panetti's *Ford* claim without comment on their ultimate soundness and remand to the district court with instructions to appoint counsel, authorize funds for investigative and expert assistance, and conduct any further proceedings to determine afresh Panetti's competency to be executed. Delivery of the process due protects the prisoner and in doing so protects us all.

No. 14-70037

PRISCILLA R. OWEN, Circuit Judge, concurring in part and dissenting in part:

This is the third time that Panetti has claimed, based on *Ford*,[1] that he is incompetent to be executed. If the federal district court's order denying Panetti's motion for funds to retain experts and investigators to pursue that claim should be affirmed, then whether the Texas state courts denied due process to Panetti is irrelevant. I would affirm the federal district court regarding funds for experts, and I therefore primarily consider the federal district court's rulings. In reversing the federal district court, the majority opinion effectively applies a de novo standard of review, though an abuse of discretion standard governs the denial of a motion under 18 U.S.C. § 3599(f),[2] and the majority opinion concludes that the passage of time is sufficient to require the appointment of experts and investigators to examine the defendant's competency anew.[3] With regard to Panetti's constitutional due process claim, the majority opinion reverses the federal district court because of two filings the State made the same day the district court issued its ruling, even though none of the district court's citations to the evidence on which it relied include the State's submissions. In so doing, the majority opinion again fails to employ proper appellate standards of review.

---

[1] *Ford v. Wainwright*, 477 U.S. 399 (1986).

[2] *See Brown v. Stephens*, 762 F.3d 454, 459 (5th Cir. 2014) ("We review the denial of funding for investigative or expert assistance for an abuse of discretion.").

[3] *Ante* at 13 ("The reality is that a decade has now passed since the last determination of whether this concededly mentally ill petitioner is competent to be executed. Given that lapse of time, we cannot say that any new evidence would only be 'supplemental' to that already contained in the record." (footnote omitted)).

No. 14-70037

I agree that Panetti was and is entitled to appointed counsel at every step of the ongoing legal proceedings.  But the error in failing to appoint counsel is not a dispositive issue and does not warrant a continued stay of execution since Panetti was actually represented by his former federal habeas counsel, who proceeded pro bono in the state courts and in federal district court, and they capably represented him.  (They are entitled to compensation for that and any future representation, as long as they remain appointed counsel pursuant to 18 U.S.C. § 3599).[4]

The dispositive question is whether the federal district court abused its discretion in denying Panetti's request for funds for experts and investigators when (1) Panetti has maintained in the most recent round of state and federal court proceedings that he cannot make the threshold showing required by *Ford* ("a substantial threshold showing of insanity")[5] unless and until a court orders funding for experts and investigators,[6] and (2) the facts presented by Panetti to the district court in support of his renewed claim that he is incompetent to be executed do not differ in any meaningful way from the facts exhaustively examined by the district court in two prior *Ford* hearings.

The panel's majority opinion obfuscates the core inquiry and, I submit with great respect, does not objectively consider the record or the actual bases for the district court's conclusion that Panetti has not made a sufficient

---

[4] *See Battaglia v. Stephens*, 824 F.3d 470, 474 (5th Cir. 2016) (citing *Rosales v. Quarterman*, 565 F.3d 308, 312 (5th Cir. 2009) (per curiam)).

[5] *Ford*, 477 U.S. at 426 (POWELL, J., concurring) (concluding that a State "may require a substantial threshold showing of insanity merely to trigger the hearing process"); *see also Panetti v. Quarterman*, 551 U.S. 930, 949 (2007) (holding that "Justice Powell's opinion [in *Ford*] constitutes 'clearly established' law for purposes of § 2254 and sets the minimum procedures a State must provide to a prisoner raising a *Ford*-based competency claim").

[6] *See, e.g., Panetti v. Stephens*, No. 1:04-CV-42-SS, slip op. at 9 (W.D. Tex. Nov. 26, 2014) ("Panetti argued before the state courts that 'although he has made a colorable showing of incompetence without necessary funding to obtain the assistance of mental-health experts, he c[an]not show his incompetence under the standard set forth in Article 46.05(e)." (quoting *Panetti v. State*, No. AP-77,049, 2014 WL 6764475, at *1 (Tex. Crim. App. Nov. 25, 2014))).

No. 14-70037

showing to require the appointment of experts in order to litigate, once again, whether he is competent to be executed.

**I**

There is no question that Panetti was entitled to appointment of counsel to represent him when the State of Texas once again set an execution date. I agree with the majority opinion on that score. But counsel actually represented Panetti, and the fact that they were not compensated at the time is not a basis for further staying the execution. The record reflects that counsel performed effectively in state court but concluded that they could not, or should not, proceed to file a motion under Texas Code of Criminal Procedure Article 46.05 without funding from a court to retain mental health experts and investigators to attempt to develop the record. The lack of experts, rather than the lack of counsel or counsel's need for additional time, was the pivotal issue in state court and in federal district court.

**II**

Quoting *Ford* and citing *Panetti*, the federal district court concluded that "Panetti has failed to make the 'threshold showing' which would trigger his entitlement to the relief he seeks."[7] The court explained that, in response to Panetti's most recent claim, it had "[c]onduct[ed] a fresh inquiry into Panetti's mental state at the threshold" and found that

> Panetti has failed to make the necessary showing of incompetency warranting, for the third time . . . authorization of funds to hire mental health experts, and a stay of execution. Panetti has extensively litigated this issue, and has presented no evidence of incompetence different in kind from that previously considered and ultimately rejected by this and other Courts.[8]

---

[7] *Panetti*, No. 1:04-CV-42-SS, slip op. at 8 (quoting *Ford*, 477 U.S. at 426 (POWELL, J., concurring) and citing *Panetti v. Quarterman*, 551 U.S. 930 (2007)).

[8] *Id.* at 13; *see also id.* at 9 ("The Court finds, considering the question in light of the wealth of evidence on the issue of Panetti's competency previously amassed in this case,

No. 14-70037

These determinations are fully supported by the record. Panetti failed to present facts to the district court regarding his behavior or mental state since the last competency hearing that would permit an expert to present opinions that materially differed from the expert opinions that the district court heard in the prior competency-to-be-executed hearings. Unless facts are presented that truly differ from the nature of the facts previously presented, there is no need to fund experts to opine further. Panetti was accorded due process.[9]

For the same reasons, the appointment of experts is not "reasonably necessary for the representation of the defendant," within the meaning of 18 U.S.C. § 3599(f). Section 3599(f) does not mandate the appointment of experts or investigators. Rather, it provides that

> [u]pon a finding that investigative, expert, or other services are *reasonably necessary* for the representation of the defendant . . . , the court may authorize the defendant's attorneys to obtain such services . . . and, if so authorized, shall order the payment of fees and expenses.[10]

This court has interpreted "reasonably necessary" to require a petitioner to show that he has "a substantial need" for the requested assistance.[11] "[A] district court may deny an inmate's request for funds 'when a petitioner has (a) failed to supplement his funding request with a viable constitutional claim that is not procedurally barred, or (b) when the sought-after assistance would only support a meritless claim, or (c) when the sought after assistance would

---

Panetti's evidence of incompetence is insufficient to make the threshold showing necessary to trigger *Ford*.").

[9] *See generally Mathews v. Eldridge*, 424 U.S. 319, 334 (1976) ("(D)ue process is flexible and calls for such procedural protections as the particular situation demands." (quoting *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972))).

[10] 18 U.S.C. § 3599(f) (emphasis added).

[11] *Brown v. Stephens*, 762 F.3d 454, 459 (5th Cir. 2014) (quoting *Riley v. Dretke*, 362 F.3d 302, 307 (5th Cir. 2004)).

only supplement prior evidence."[12]   Our review of the district court's ruling is for abuse of discretion.[13]

Panetti's current claim that he is incompetent to be executed is not "a viable constitutional claim"[14] because, as the district court found, the facts supporting his most recent claim of incompetency are not different in kind from the facts supporting an earlier claim of incompetency.  The earlier claim was rejected after an extensive hearing, detailed findings by the district court, and appellate review by this court and the Supreme Court.

Because the facts presented to the district court in support of Panetti's most recent *Ford* claim are not different in kind from those supporting his last claim of incompetency, the expert assistance that is sought "would only supplement prior evidence."[15]   In the prior competency hearing, the district court considered expert opinions that Panetti was incompetent to be executed. Those opinions were based on the same "kind" of facts that Panetti has presented in support of his most recent claim of incompetency,[16] and the federal district court did not find those expert opinions persuasive.

In analogous circumstances, this court held in *Smith v. Dretke*, a capital case, that the district court did not abuse its discretion in denying funds for the assistance of a psychologist in federal habeas proceedings.[17]   Smith argued that an expert could evaluate his drug and alcohol abuse "to determine whether it would support a defense mitigation theory," but this court held that

---

[12] *Id.* (quoting *Smith v. Dretke*, 422 F.3d 269, 288 (5th Cir. 2005)); *see also Smith*, 422 F.3d at 288 (interpreting former 21 U.S.C. § 848(q)(9), the predecessor to 18 U.S.C. § 3599(f), the same way); USA Patriot Improvement and Reauthorization Act of 2005, Pub. L. No. 109-177, § 222, 120 Stat. 192, 231 (2006).

[13] *See Brown*, 762 F.3d at 459.

[14] *Id.*

[15] *Id.*

[16] *See Panetti v. Stephens*, No. 1:04-CV-42-SS, slip op. at 13 (W.D. Tex. Nov. 26, 2014).

[17] 422 F.3d at 288-89.

No. 14-70037

"[t]he question of mental capacity . . . was presented in this instance to the jury at trial" and that the evidence Smith sought to develop would only be supplemental.[18]  The federal district court in the present case heard a vast amount of evidence presented by Panetti in the prior competency hearing, and the district court found that the new evidence that Panetti presented was not different in kind from that already considered.  The assistance of new experts would only supplement prior evidence of the same nature.

### III

The bases upon which the majority opinion reverses the district court's denial of funding for experts do not withstand analysis.

### A

The majority opinion concludes that "[r]ather than . . . cleansing . . . the denial of due process [by the state courts] we have described,"[19] the federal district court, "[p]ressed by the looming execution date, . . . proceeded upon the flawed record that denial produced."[20]  The "result was nigh inevitable,"[21] and the federal district court likewise denied Panetti due process, the majority opinion concludes.[22]

The federal district court had before it Panetti's motion to stay the execution and a motion to fund experts.  The district court was certainly aware that it could grant a stay of the impending execution if the court needed additional time.  It did not grant such a stay, and in light of the decades of experience that the judge possesses, and the detailed order that the court issued, it is evident that the court denied the motion for a stay after careful

---

[18] *Id.*
[19] *Ante* at 17.
[20] *Ante* at 17.
[21] *Ante* at 17.
[22] *Ante* at 15.

25

deliberation, not because it was "[p]ressed by the looming execution date."[23] Panetti was urging the district court to give him more time to develop a factual record regarding his competency and to appoint experts to review the evidence of Panetti's mental state since the last competency hearing.  That could not have been lost on the federal district court.  Panetti argued to the federal district court that the record in the state court was inadequate and that he had been denied due process.  The district court nevertheless denied Panetti's motion for appointment of experts.  The request for funding for experts was the primary thrust of Panetti's motion in the federal district court.  To suggest that the district court was led down the proverbial primrose path by error in the state courts implies that the federal district court was either impotent or inept. It was neither.  The district court ruled on the 18 U.S.C. § 3599(f) motion to appoint experts after "[c]onducting a fresh inquiry into Panetti's mental state at the threshold."[24]  The federal district court was well within its discretion in denying that motion.

## B

As discussed, our court has held that a district court may deny a § 3599(f) motion to fund experts "when the sought after assistance would only supplement prior evidence."[25]  The majority opinion concludes that "[t]he reality is that a decade has now passed since the last determination of whether this concededly mentally ill petitioner is competent to be executed.  Given that lapse of time, we cannot say that any new evidence would only be 'supplemental' to that already contained in the record."[26]  This is erroneous for at least three reasons.

---

[23] *Ante* at 17.

[24] *Panetti v. Stephens*, No. 1:04-CV-42-SS, slip op. at 13 (W.D. Tex. Nov. 26, 2014).

[25] *Brown*, 762 F.3d at 459 (quoting *Smith*, 422 F.3d at 288).

[26] *Ante* at 13 (footnote omitted).

No. 14-70037

First, the burden of proof is on the defendant who is seeking public funding for experts. The lapse of time says nothing about whether the evidence the defendant hopes to offer through an expert will be new, rather than supplemental, evidence. The majority opinion fails to hold Panetti to his burden of proof.

Second, and more fundamentally, it cannot simply be assumed, as the majority opinion does, that because of the passage of time, appointment of experts is "reasonably necessary."[27] Such an assumption is an arbitrary interpretation and application of § 3599(f), and it is a standardless means of allowing federal courts to second-guess and reverse state courts, contrary to the precepts contained in AEDPA.

Third, such an assumption is not a valid reason for reversing a federal district court when we are reviewing a denial of funding for experts under § 3599(f). Our review is for an abuse of discretion. We cannot legitimately say that, as a matter of law, a district court must grant funding for experts to examine a defendant's competency when the last competency hearing was years earlier, even when all agree that the defendant suffers from mental illness.

## C

The majority opinion places great, and repeated, emphasis on the fact that the State filed an expert's affidavit in the Texas Court of Criminal Appeals (TCCA) and in the federal district court, and that, without notice to Panetti, the State recorded a two-hour conversation he had with his parents on November 4, 2014.[28] However, neither the affidavit nor the recording was

---

[27] *Ante* at 13 (quoting 18 U.S.C. § 3599(f)).

[28] *See, e.g., ante* at 14 ("[The State] deployed its able death penalty lawyers, aided by a medical expert, Dr. Penn, and recorded Panetti with his family—filing Dr. Penn's affidavit and the recording with both the TCCA and federal district court.").

No. 14-70037

actually considered by the TCCA or relied upon by the federal district court. The majority opinion is incorrect in concluding that the mere filing of the affidavit or recording resulted in a denial of due process to Panetti and warrants reversing the federal district court.

After the state trial court denied Panetti's request for funding for experts and a stay of the execution, and while an appeal of that ruling was pending before the TCCA, the State, on November 24, 2014,[29] filed with the TCCA an affidavit from Dr. Joseph Penn, Director of Mental Health Services in the Correctional Managed Care division of the University of Texas Medical Branch. Dr. Penn had reviewed Panetti's medical records and opined in the affidavit that Panetti did not exhibit behaviors that interfered with his daily functioning or required treatment with medications. The State had also recorded a conversation that occurred on November 4, 2014, between Panetti and his parents. The recordings were made without Panetti's knowledge, which certainly was not a violation of due process. An inmate's phone conversations may be intercepted and recorded unless privileged,[30] and Panetti's conversation with his parents was not privileged. He does not contend otherwise. Panetti had no expectation of privacy when he conversed with his parents.[31] Regardless, however, neither the Penn affidavit nor the

---

[29] *See* Reply Brief of the State of Texas, *State v. Panetti*, No. AP-77,049, 2014 WL 6764475 (Tex. Crim. App. Nov. 25, 2014).

[30] *See United States v. Harrelson*, 754 F.2d 1153, 1168-69 (5th Cir. 1985) (rejecting a challenge to evidence obtained through electronic surveillance and upholding the admissibility of recordings of conversations of an inmate with his wife and brother, an attorney, concluding the conversations were not privileged).

[31] *See id.* at 1169 ("The question presented here is thus whether the Harrelsons had a reasonable expectation of privacy as they spoke to each other in jail. The answer must be that they did not. It is unnecessary to consult the case law to conclude that one who expects privacy under the circumstances of prison visiting is, if not actually foolish, exceptionally naive."); *see also United States v. Van Poyck*, 77 F.3d 285, 290-91 (9th Cir. 1996) ("[N]o prisoner should reasonably expect privacy in his outbound telephone calls."); *United States v. Sababu*, 891 F.2d 1308, 1329 (7th Cir. 1989) ("We believe that it was unreasonable for [the

No. 14-70037

2014 recorded conversation was considered by the TCCA or the federal district court.

We know, as a matter of law, that the TCCA did not consider or rely on the Penn affidavit or the recording because one day after the State's filing, the TCCA denied Panetti's petition on the basis that it lacked jurisdiction to review the trial court's order.[32]  The TCCA reasoned that Panetti had not filed an Article 46.05 pleading and that no authority permitted the court to review a "freestanding motion," such as the one that Panetti had filed.[33]  (The TCCA did not, as the majority opinion asserts,[34] state that untimeliness was an additional reason for denying the motion).  Accordingly, the TCCA did not reach the merits of Panetti's claim, and the State's new evidence played no part in the TCCA's ruling.

The majority opinion says this "misses the point."[35]  It then engages in an impassioned argument and cites the dissenting opinion in the TCCA.[36]  But none of what the majority opinion says addresses whether this court can legitimately say that the State's mere filing of the Penn affidavit or the recording with the TCCA amounted to a denial of due process.  As a court, we must adhere to well-settled principles of appellate review.  We must consider the actual holding in the TCCA's order, issued by a majority of that court.  That order reflects that the TCCA concluded that the court did not have jurisdiction to consider Panetti's motion, which means that it did not, *as a matter of settled law*, consider either the Penn affidavit or the recorded conversation.  This court

---

defendant] to expect that telephone calls she placed to an inmate in a high-security federal penitentiary would be private.").

[32] *Panetti v. State*, No. AP-77,049, 2014 WL 6764475, at *1 (Tex. Crim. App. Nov. 25, 2014).

[33] *Id.*

[34] *Ante* at 8.

[35] *Ante* at 15.

[36] *Ante* at 15-16.

cannot, therefore, conclude that filing the affidavit or recording with the TCCA resulted in a due process violation.

With regard to the federal district court's denial of funds for experts, the majority opinion says that the district court "stated that it had considered 'the wealth of evidence on the issue of Panetti's competency,'" and "that basis for conclusion surely included all of the State's last-minute submissions."[37]  The opinion then asserts that the federal district court must have affirmatively "weigh[ed] Panetti's" new evidence against "the state's evidence of Dr. Penn's affidavit and the recording of Panetti and his family."[38]  However, when a district court sets forth the *specific factual bases* for its factual findings, as in the present case, an appellate court cannot assume that the district court relied on other facts in the record to *reverse* the district court, if the appellate court is properly applying the abuse of discretion standard.  The district court's order reflects that its finding were reached after considering *Panetti's* new evidence (not the State's) as weighed against the evidence "previously amassed in this case,"[39] which unmistakably refers to the prior competency hearings.

The State filed the Penn affidavit with the federal district court on November 26, 2014, as an attachment to its response to Panetti's motion for a stay of execution, appointment of counsel, and request for funding for experts. The district court's decision, denying Panetti's requests, issued the same day, November 26, 2014.  The only possible mention of the State's new evidence is a reference in the opening paragraph of the federal district court's order to "Respondent's Response in Opposition [#181]" and the statement in that same

---

[37] *Ante* at 16.

[38] *Ante* at 17.

[39] *Panetti v. Stephens*, No. 1:04-CV-42-SS, slip op. at 9 (W.D. Tex. Nov. 26, 2014) ("The Court finds, considering the question in light of the wealth of evidence on the issue of Panetti's competency previously amassed in this case, *Panetti's evidence* of incompetence is insufficient to make the threshold showing necessary to trigger *Ford*." (emphasis added)).

paragraph that the court had "reviewed the documents, the governing law, and the file as a whole."[40]  However, the district court's analysis of the evidence and its reasoning reflect that it did not rely on the State's new evidence at all in concluding that Panetti had failed to present "a substantial threshold showing of insanity"[41] and was competent to be executed.  The district court's order details the evidentiary basis for its conclusions and provides citations, none of which are to the *State's* new evidence.  The federal district court considered only *Panetti's* evidence[42] and whether Panetti's behavior, as documented in *Panetti's* evidence, was "measurably different from the behavior documented in the records scrupulously examined by this Court in its March 26, 2008 Order."[43]  The district court then detailed evidence from Panetti's prior competency hearings.[44]

The majority opinion declares that "it is one thing to respond to a petitioner's claims on the existing record; it is quite another, with assistance of counsel and paid experts, to generate new evidence while preventing the petitioner from doing the same."[45]  The majority opinion concludes that Panetti is entitled to proceed to prepare yet another federal habeas petition "with fully armed counsel," meaning counsel armed with experts.[46]

If the district court judge had done what the majority opinion says he did, I would join in reversing the district court's judgment.  But he did not.  He prudently considered only the new evidence offered by Panetti, measured it against the mountain of evidence adduced in prior proceedings, and correctly

---

[40] *Id.* at 1 (brackets in original).

[41] *See Ford v. Wainwright*, 477 U.S. 399, 426 (1986) (POWELL, J., concurring).

[42] *Panetti*, No. 1:04-CV-42-SS, slip op. at 8-9.

[43] *Id.* at 8-12.

[44] *Id.* at 10-12.

[45] *Ante* at 14.

[46] *Ante* at 15.

concluded that *Panetti's* new evidence (not the State's new evidence) was not "measurably" different from the evidence that the district court had previously considered.

## D

The majority opinion recounts evidence, emphasized in an amicus brief, to argue that Panetti has made an adequate showing that he is incompetent to be executed.[47]  All of this evidence was presented to the federal district court in Panetti's submissions to that court in greater detail than set forth in the majority opinion, and none of it is different in kind or nature from evidence that the district court heard in Panetti's prior competency hearings.

The citations to the arguments counsel made in briefing to the federal district court are footnoted following each of the factual matters set forth in the majority opinion[48] as follows:

- "escorting officers have noticed that Panetti often acts in an irrational and delusional manner"[49]

---

[47] *Ante* at 18.

[48] *Ante* at 18.

[49] *See* Motion for Stay of Execution at 13-14, *Panetti v. Stephens*, 1:04-CV-42-SS (W.D. Tex. Nov. 25, 2014), ECF No. 176:

Less then [sic] a year ago, during mental health rounds, one of the treatment staff reported that:

While passing [Mr. Panetti's] cell, offender began making irrational comments to the escorting officer about the food trays. MHCM [Mental Health Care Management] asked offender how he was doing.  He talked about his belief in God maintaining him but said he was thinking of contacting MH [Mental Health]. MHCM inquired as to why.  He said he thinks he may need some assistance.  After a few minutes of interviewing the offender, it appears that the offender is reporting that he has always heard voices, but for many years has dealt with them though reading the bible [sic] and prayer.  He said a long time ago (before EMR [Electronic Medical Record]) he took antipsychotics.  He said he remembers most of them caused him severe SEs [side effects] so he decided not to take them, but he asked if he could be referred to a clinician because he thinks he may need medicine again.  He

No. 14-70037

- "despite having refused mental health treatment for nearly two decades, Panetti has, in the last few years, begun requesting mental health assistance and medication"[50]

- "Panetti has expressed the belief that Texas has implanted a listening device in his tooth that sends command messages to his brain"[51]

- "Panetti reads the Gospel to help drown out the voices he hears"[52]

- "Panetti has expressed the belief that CNN anchor Wolf Blitzer displayed Panetti's stolen TDCJ ID card during a report"[53]

- "Panetti has claimed to be the father of actress and singer Selena Gomez"[54]

---

is finding it more difficult to function with only prayer and bible [sic] reading to sustain him, particularly over the past two years. MHCM told the offender he would review the record and make referrals as indicated.

[50] *See id.*; *see also id.* at 15 ("TDCJ records indicate that in the past two years alone, Mr. Panetti made at least three additional requests for mental health assistance. On August 17, 2012, he submitted a written request for an 'overall check-up,' including a mental health assessment. Ex. C at 8. On November 12, 2013, Mr. Panetti filed a Health Services request, asking to see a 'psych.' *Id.* at 9. Finally, on November 21, 2013, Mr. Panetti wrote to complain about not getting enough protein and salt in his diet, admitting that 'my mental health seems to be affected.' *Id.* at 10.").

[51] *See id.* at 26 (reflecting an account from one of Panetti's lawyers that "Mr. Panetti also pointed to a gold tooth on the right side of his mouth. He suggested, via a combination of mouthed words and pointing and exaggerated nodding, that he thought TDCJ had implanted a listening device in the gold tooth."); *id.* at 28 ("Later, he told [one of his attorneys] that he thought he was hearing voices from the surveillance device implanted in his tooth. He believes that TDCJ correctional officers receive details about his actions and thoughts transmitted through the 'Bluetooth' technology installed in his mouth.").

[52] *See id.* at 25 ("Mr. Panetti said that he hears voices. When he hears them, he reads the Gospel to keep the voices from overwhelming him.").

[53] *See id.* at 28 (stating that Panetti told counsel that "CNN aired a report in which Wolf Blitzer displayed Mr. Panetti's TDCJ ID card, which had been stolen from him.").

[54] *See id.* ("Mr. Panetti said that . . . [h]e is the father of the actress Selena Gomez.").

33

No. 14-70037

The federal district court found that "[w]hile much of the behavior recounted in the new TDCJ records provided by Panetti is certainly strange, it is not measurably different from the behavior documented in the records scrupulously examined by this Court in its March 26, 2008 Order."[55]   The district court's order under consideration in the present appeal then sets forth some of the evidence from the prior competency hearings that is no different in kind or character from Panetti's new evidence:

> For example, as explained in the [March 26, 2008] Order, Dr. Mary Alice Conroy testified during this Court's 2004 evidentiary hearing that Panetti "believed he has been under attack by 'supernatural demonic anti-forces' since the mid-1980s, when demons were possessing his house and personal belongings."   Mar. 26, 2008 Order [#145] at 26.   Panetti told Conroy he believed the State "want[ed] to execute him to stop him from preaching[.]"   *Id.* Panetti discussed the alleged influence of his alternate personality, "Sarge," over him when he committed the 1992 murders with at least two of the 2004 experts.   *Id.*   During the 2008 evidentiary hearing, Panetti told Dr. David Self he was on Death Row "[t]o preach the Gospel of Jesus Christ" and he was sentenced to die because people "have strong delusions."   *Id.* at 32-33.   Panetti discussed his purported multiple personalities with Self, who summarized the discussion:
>
>> Will James was 'king of the cowboys' and had written 24 books, and was a boyhood hero and fantasy object of [Panetti's].   He described Sergeant Iron Horse ["Sarge"] as having begun as a childhood fantasy of 'the eternal mercenary' but later in life having been a manifestation of mental illness, and that the mental illness was a manifestation of spiritual wickedness. . . .   He claims that command type hallucinations from Sergeant Iron Horse were partially responsible for his having murdered his in-laws.   He also reported that he heard 'demons cackling'

---

[55] *Panetti v. Stephens*, No. 1:04-CV-42-SS, slip op. at 9-10 (W.D. Tex. Nov. 26, 2014).

No. 14-70037

after the murders, and that those same demons cackled at Jesus' crucifixion.[56]

Facts set forth in the district court's decision at the conclusion of the last competency hearing, in 2008,[57] regarding Panetti's mental state and behavior are not materially different from the more recent facts that the majority opinion recounts. For example:

- "[Panetti's] wife described episodes of 'paranoid thinking including a belief the devil was in the furniture and burying some [furniture] outside; nailing curtains shut so neighbors wouldn't film them etc.'"[58]

- "Panetti stated he has heard voices and music since he was an adolescent (prior to any alcohol or drug abuse), but the voices do not tell him to harm himself or others. He stated he drank alcohol 'to quiet the voices.'"[59]

- "Panetti also stated he had post traumatic stress disorder (PTSD) from his time as a Navy SEAL with a top secret security clearance in Thailand and Cambodia. He recounted detailed stories about this experience, but the evaluator noted 'his military records show he was never overseas.'"[60]

- "[I]n December of 1995, Panetti was referred to the Jester IV Crisis Management unit of the Texas Department of Corrections because he 'appear[ed] to be delusional and verbalized auditory and visual hallucinations.'"[61]

- "In June of 1996, Panetti began refusing to groom because he had taken a 'Nazarat vow' as 'an alternative to his not getting the medical and psychiatric treatment he thinks he needs.'"[62]

---

[56] *Id.* at 10 (alterations in original).

[57] *Panetti v. Quarterman*, No. A-04-CA-042-SS, 2008 WL 2338498 (W.D. Tex. Mar. 26, 2008).

[58] *Id.* at *5 (alterations in original).

[59] *Id.* at *6 (citation omitted).

[60] *Id.* at *11 (citation omitted).

[61] *Id.* at *13 (alterations in original).

[62] *Id.*

35

No. 14-70037

- "In October of 1996, Panetti reported hearing 'Bob Dylan lyrics' in his head and feeling 'spiritually persecuted' because of his beard."[63]

- "While his state application was pending, on September 29, 1997, Panetti was again admitted to the Jester IV Acute Care Unit, complaining of auditory and visual hallucinations. He had told TDCJ medical staff he 'needed to get back on my medicine that I had in the freeworld.'"[64]

- "[H]e told the State's experts the same thing he told the defense experts: he believed the State wanted to execute him for preaching the gospel."[65]

- "Panetti did claim to have seen angels who appeared in the form of TDCJ corrections officers on several occasions since [he claims to have been healed of his mental illness]."[66]

- "Dr. Self noted that Panetti's medical history contains references to delusions and hallucinations as far back as the late 1970's, which predate any motive to malinger."[67]

- "[In 2007, Panetti] made reference to conspiracies, such as big corporations and the Bush family being in league with the devil. He described two instances in which angels visited him in the form of correctional officers."[68]

In short, there was nothing new about the evidence that Panetti presented to the federal district court regarding his most recent, and third, *Ford* claim. Experts had opined in 2008 that Panetti was not competent to be executed based on the foregoing, and many other, facts. The federal district court's decision at the conclusion of the last competency-to-be-executed hearing

---

[63] *Id.*

[64] *Id.* (citation omitted).

[65] *Id.* at *17.

[66] *Id.* at *20.

[67] *Id.* at *21.

[68] *Id.* at *22.

reflected that the "2008 hearing was exhaustive."[69]  The court "heard expert opinions from psychiatrists, pyschologists [sic], and neuropsychologists for both Panetti and the State."[70]  It "heard testimony from fellow inmates and the guards and chaplain who have had contact with Panetti on Death Row."[71]  The federal district court "reviewed volumes of medical, social security, and prison records regarding Scott Panetti's longstanding mental illness and delusions" and heard "eleven hours of conversations between Panetti himself and his parents and other visitors, recorded by the State during his visitation hours in December of 2007 and January of 2008."[72]  The district court was not persuaded by the opinions or analyses of Panetti's experts in the 2008 hearing and found Panetti competent to be executed.[73]

In the present case, the evidence is overwhelming that "the sought after assistance would only supplement prior evidence"[74] and therefore that the district court did not abuse its discretion in denying Panetti's motion under 18 U.S.C. § 3599(f) for funds to retains more experts.  Nor can it plausibly be said that due process requires appointment of experts.

## IV

 "Prior findings of competency do not foreclose a prisoner from proving he is incompetent to be executed because of his present mental condition."[75]  It should also be evident that "[e]ach competency proceeding may well be a discrete proceeding that is largely if not entirely independent of the outcome

---

[69] *Id.* at *2.

[70] *Id.*

[71] *Id.*

[72] *Id.*

[73] *Id.* at *37.

[74] *Brown v. Stephens*, 762 F.3d 454, 459 (5th Cir. 2014) (quoting *Smith v. Dretke*, 422 F.3d 269, 288 (5th Cir. 2005)).

[75] *Panetti v. Quarterman*, 551 U.S. 930, 934 (2007).

of prior incompetency proceedings."[76]  But when the evidence in support of a successive *Ford* claim is no "different in kind from that previously considered and ultimately rejected by this and other Courts," as found by the district court in the present case,[77] then a defendant should not be entitled to a successive *Ford* hearing.

The Supreme Court has not articulated the threshold showing that a capital defendant, previously found to be competent to be executed, must make when he subsequently challenges his competency anew.  Concern was raised, however, in *Ford v. Wainwright*[78] itself regarding successive claims by condemned inmates that they are not competent to be executed.

In *Ford*, JUSTICE MARSHALL opined that "[i]t may be that some high threshold showing on behalf of the prisoner will be found a necessary means to control the number of nonmeritorious or repetitive claims of insanity."[79] JUSTICE O'CONNOR warned of a potentially endless cycle of competency litigation in her dissent:

> [T]he potential for false claims and deliberate delay in this context is obviously enormous.  This potential is exacerbated by a unique feature of the prisoner's protected interest in suspending the execution of a death sentence during incompetency.  By definition, this interest can *never* be conclusively and finally determined: Regardless of the number of prior adjudications of the issue, until the very moment of execution the prisoner can claim that he has become insane sometime after the previous determination to the contrary.[80]

JUSTICE REHNQUIST noted in his dissent that "[a] claim of insanity may be made at any time before sentence and, once rejected, may be raised again; a

---

[76] *Green v. Thaler*, 699 F.3d 404, 421-22 (5th Cir. 2012) (OWEN, J., concurring).

[77] *Panetti v. Stephens*, No. 1:04-CV-42-SS, slip op. at 13 (W.D. Tex. Nov. 26, 2014).

[78] 477 U.S. 399 (1986).

[79] *Id.* at 417.

[80] *Id.* at 429 (O'CONNOR, J., concurring in part and dissenting in part) (citation omitted).

prisoner found sane two days before execution might claim to have lost his sanity the next day, thus necessitating another judicial determination of his sanity."[81]

The controlling opinion in *Ford* was that of JUSTICE POWELL,[82] and in *Panetti*, the Court confirmed that JUSTICE POWELL's opinion "states the relevant standard as follows.  Once a prisoner seeking a stay of execution has made 'a substantial threshold showing of insanity,' the protection afforded by procedural due process includes a 'fair hearing' in accord with fundamental fairness."[83]  The Court explained that "[t]his protection means a prisoner must be accorded an 'opportunity to be heard,' though 'a constitutionally acceptable procedure may be far less formal than a trial.'"[84]

The due process framework set forth in *Ford* and *Panetti* was applied to a defendant's first claim that he was incompetent to be executed.  The Court did not indicate whether the same construct would apply after a defendant had been found competent to be executed in proceedings that had accorded him full due process.  But it would seem illogical for the Court to conclude that the *same evidence* presented in the first proceeding could be used to establish "a substantial threshold showing of insanity"[85] when a second claim was subsequently asserted.  To do so would accord no finality to prior adjudications.  If it is correct that when a defendant relies only on the same evidence previously presented in a competency hearing at which he was found competent, he has failed to make a "substantial threshold showing of insanity" in a subsequent claim of incompetence, it follows that if new evidence

---

[81] *Id.* at 435 (REHNQUIST, J., dissenting).

[82] *See Panetti v. Quarterman*, 551 U.S. 930, 949 (2007) (citing *Marks v. United States*, 430 U.S. 188, 193 (1977)).

[83] *Id.* at 949 (quoting *Ford*, 477 U.S. at 426, 424 (POWELL, J., concurring)).

[84] *Id.* (citation omitted) (quoting *Ford*, 477 U.S. at 424, 427 (POWELL, J., concurring)).

[85] *Id.* (quoting *Ford*, 477 U.S. at 426 (POWELL, J., concurring)).

presented to support a second claim is not "different in kind from that previously considered,"[86] then due process does not require all of the procedures that were employed when the competency claim was first raised. Due process requires an opportunity to be heard so that a court may assess whether there is a reasonable probability that the defendant's mental condition has changed to the point that he is incompetent to be executed.

Panetti had an opportunity to be heard, the federal district court considered the merits of his competency claim, and Panetti failed to make the necessary threshold showing. A further stay of execution and the appointment of new experts are not warranted and are not required in order to provide due process to Panetti.

What our court said in upholding the district court's conclusion that Panetti was competent to be executed, after considering all of the evidence presented in the prior competency hearing, bears repeating:

> The district court then turned to apply its "rational understanding" test to the facts at hand. After reviewing the expert testimony on Panetti's competency in painstaking detail, the court agreed with the defense's experts that "Panetti is seriously mentally ill" and concluded that "it is not seriously disputable that Panetti suffers from paranoid delusions of some type." However, the court implicitly agreed with the State that Panetti was exaggerating some of his symptoms to avoid execution, observing that Panetti demonstrated a "fairly sophisticated understanding of his case" and that his refusal to cooperate with the State's experts stood in marked contrast to his treatment of the defense's experts. Ultimately, the court determined that Panetti "has both a factual and rational understanding of his crime, his impending death, and the causal retributive connection between the two," as demonstrated "most clearly" by his statements to Dr. Waldman "that the death penalty is wrong in his case because he was schizophrenic when he killed his in-laws." According to the court, Panetti's remarks imply that he "understands he is being

---

[86] *Panetti v. Stephens*, No. 1:04-CV-42-SS, slip op. at 13 (W.D. Tex. Nov. 26, 2014).

No. 14-70037

executed to punish him for killing his in-laws, but feels the state is not justified in taking this position because of his mental illness." As "*Ford* . . . does not require that a prisoner agree with his punishment—simply that he rationally understand it," the court concluded that Panetti was competent to be executed.[87]

Panetti has not presented any evidence that his current competency to be executed is any different from what is described above.

*    *    *

I agree that Panetti is entitled to representation by paid appointed counsel, but I would otherwise affirm the district court's order, in which it determined that Panetti is not entitled to funds for experts and that he is competent to be executed. I would therefore lift the stay of execution.

---

[87] *Panetti v. Stephens*, 727 F.3d 398, 406 (5th Cir. 2013) (alteration in original) (footnotes omitted); *see also Panetti v. Quarterman*, No. A-04-CA-042-SS, 2008 WL 2338498 (W.D. Tex. Mar. 26, 2008).